UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

SIERRA NEVADA FOREST
PROTECTION CAMPAIGN, SIERRA
CLUB, and LASSEN FOREST
PRESERVATION GROUP,

      Plaintiffs,

      v.

LAURIE TIPPIN, in her official
capacity as Forest Supervisor
of the Lassen National Forest,
BERNARD WEINGARDT, in his
official capacity as Regional
Forester; and UNITED STATES
FOREST SERVICE,

      Defendants.
_____/

NO. CIV. S 06-00351 FCD DAD

MEMORANDUM AND ORDER

----oo0oo----

    This matter is before the court on cross motions for summary

judgment filed by plaintiffs, Sierra Nevada Forest Protection

Campaign, Sierra Club, and Lassen Forest Preservation Group

(collectively "plaintiffs"), and defendants, Laurie Tippin,

1

1   Bernard Weingardt, and the United States Forest Service

2   (collectively "defendants" or "Forest Service").  The court heard

3   oral argument from parties' counsel on August 4, 2006.

4                **FACTUAL AND PROCEDURAL BACKGROUND**[1]

5   **A.   The Creeks Forest Health Recovery Project**

6        The present controversy surrounds the Creeks Forest Health

7   Recovery Project ("the Project"), a resource management project

8   located within the Lassen National Forest, Almanor Ranger

9   District.  (Pls.' Resp. To Defs.' Statement of Undisputed Facts

10  ("DSUF"), filed July 21, 2006, ¶ 1).  The Project area

11  encompasses approximately 33,000 acres and is located twelve

12  miles south of Chester, California, within Plumas County.  (DSUF

13  ¶ 2).

14       As outlined, the Project includes various techniques for

15  resource management, including the construction of a strategic

16  system of fuel breaks called defensible fuel profile zones

17  ("DFPZs"), and two uneven-aged methods of timber harvest: group

18  selection and harvest by selection of individual trees.  (DSUF ¶

19  4).  DFPZs are a strategic system of linear fuelbreaks with open

20  forest cover and dominated by larger, fire-tolerant trees.  (DSUF

21  ¶ 4).  The stated purpose of DFPZs is to create a system of

22  fuelbreaks to provide fire suppression personnel relatively safe

23  locations from which to take action against wildfires.  (DSUF ¶

24  8).  Group selection involves harvest of patches (.25 to 2 acres)

25  of forest for the purposes of regenerating uneven-aged stands and

26  promoting the growth of shade-tolerant trees.  (DSUF ¶ 4).  The

27  _____

28       [1]     The following facts are undisputed, except where noted
    to the contrary.

stated purpose of group selection to achieve an all-age, multi-story, fire-resilient forest while contributing to the local economy through a sustainable output of forest products.  (DSUF ¶ 10).  The stated purpose of individual tree selection is to lower forest stand densities by removing small to intermediate-sized trees in order to improve forest health, assist in the maintenance of late-successional forest conditions, and assist the DFPZs in creating a strategic network of areas with reduced fuel concentrations where fire severity and spread would be reduced.  (DSUF ¶ 9).

Specifically, the Project authorizes approximately 10,376 acres of logging, including 5,905 acres of DFPZs, 3,285 acres of individual tree selection (area thinning), and 1,245 acres of group selection treatments.  (DSUF ¶ 6).  In all treatment areas, trees greater than 30 inches diameter at breast height ("dbh") would be retained, except where removal is required for operability or safety reasons.  (DSUF ¶ 6).  In the group selection areas, approximately 1,150 acres would be interplanted. (DSUF ¶ 6).  Approximately 150 acres of group selection treatment would be left to regenerate naturally.  (DSUF ¶ 6).

**B.    Regulatory Framework**

Forest planning decisions are impacted by several overlapping statutory and regulatory regimes.

### 1.    National Environmental Policy Act

The National Environmental Policy Act, 42 U.S.C. § 4321, et seq., ("NEPA"), was enacted by Congress in 1969 to "declare a national policy which will encourage productive and enjoyable harmony between man and his environment; promote efforts which

will prevent or eliminate damage to the environment . . . [and]
to enrich the understanding of the ecological systems and natural
resources important to the nation. . .."  42 U.S.C. § 4321.
Despite this ambitious declaration of purpose, NEPA has been
interpreted as essentially procedural.  See Blue Mountains
Biodiversity Project v. Blackwood, 161 F.3d 1208, 1212 (9th Cir.
1998)(noting that the purpose of NEPA is to 'ensure a process,
not to ensure any result.'").  The NEPA process is designed to
"ensure that the agency . . . will have detailed information
concerning significant environmental impacts; it also guarantees
that the relevant information will be made available to the
larger [public] audience."  Blue Mountains, 161 F.3d at 1212.

### 2.   National Forest Management Act

The National Forest Management Act of 1976, 16 U.S.C. §
1604, et seq., ("NFMA"), requires the Secretary of Agriculture to
"develop, maintain, and, as appropriate, revise land and resource
management plans for units of the National Forest System."  16
U.S.C. § 1604(a).  The Forest Service, which manages the System,
develops land and resource management plans pursuant to the NFMA,
and uses these forest plans to "guide all natural resource
management activities," including use of the land for "outdoor
recreation, range, timber, watershed, wildlife and fish, and
wilderness."  16 U.S.C. § 1604(e)(1); 36 C.F.R. § 219.1(b).  In
developing forest plans, the Service must take both environmental
and commercial goals into account.  See e.g., 16 U.S.C. §
1604(g); 36 C.F.R. § 219.1(a).

Forest planning occurs at two levels: forest and project.
At the forest level, the Forest Service develops a Forest Plan,

4

which is a broad, long-term programmatic planning document for an entire National Forest.  Each Forest Plan includes goals and objectives for individual units of the forest and provides standards and guidelines for management of forest resources. Consistent with its obligations under the NFMA, in 1993, the Forest Service adopted the Lassen National Forest Land and Resource Management Plan (the "Lassen LRMP"), which provides standards and guidelines for project-level planning within the Lassen National Forest.  In 1999, the Forest Service adopted the Herger-Feinstein Quincy Library Group (QLG) record of decision (ROD) which amended the LRMP for the Lassen National Forest and other national forests in the Northern Sierra Nevada.  In 2001, the Forest Service approved the Sierra Nevada Forest Plan Amendment (SNFPA), also known as the Sierra Nevada Framework, which amended the LRMPs for all national forests in the Sierra Nevada (the "2001 Framework").  Finally, in 2004, the Forest Service replaces the 2001 Framework with a new plan, referred to as the 2004 Framework or 2004 Supplement, which also amended the LRMPs for all Sierra national forests.  Because the Project lies within the Lassen National Forest, it must be consistent with the 1993 Lassen LRMP, as amended by the QLG ROD and the 2004 Framework.

**C.   History of the Creeks Forest Health Recovery Project**

The Forest Service initiated the scoping process for the Project in June 2004.  (Defs.' Resp. To Pls.' Statement of Undisputed Facts ("PSUF"), filed June 26, 2006, ¶ 13).  On June 4, 2004, a scoping letter, including a detailed description of the proposed action and a map showing the location of the

5

proposed action, was sent to interested parties.  (DSUF ¶ 11).

Plaintiffs submitted detailed comments in response, describing

the kind of information, analysis, and alternatives that should

be included in the environmental analysis for the project.  (PSUF

¶ 13).  On February 14, 2005, the Forest Service initiated a

second scoping process and announced that an Environmental Impact

Statement ("EIS") would be prepared in connection with the

Project.  (DSUF ¶ 12).  Plaintiffs also submitted comments in

response to the second scoping period, in particular, urging that

the EIS consider all reasonable alternatives, including

alternatives that would protect trees 20" diameter and greater,

that maintain canopy cover at 50% or greater, and that is

consistent with the 2001 Framework.  (PSUF ¶ 13).

In May 2005, the Forest Service issued a draft EIS ("DEIS")

for the Project, including a proposed action.  (PSUF ¶ 14; DSUF ¶

13).  Other than the proposed action and "no action," the DEIS

failed to consider in detail any alternatives.  (PSUF ¶ 14).  On

June 6, 2005, the Forest Service initiated a formal 30-day notice

and comment period on the Project DEIS by publishing a notice in

the Lassen County Times.  (DSUF ¶ 13).  Plaintiffs filed comments

on the DEIS, together with critiques from experts in the field of

wildlife biology and fire ecology.  (PSUF ¶ 14).  In their

comments, plaintiffs argue that the Forest Service had (1) failed

to disclose important information about environmental impacts;

(2) failed to analyze all significant issues; and (3) failed to

consider reasonable alternatives.  (RSUF ¶ 14).  Wildlife

biologists who reviewed the plan concluded that the Project would

adversely affect the spotted owl, marten, and fisher, potentially

threatening the viability and distribution of these species.
(RSUF ¶ 14).  The Forest Service prepared a substantive response
to the comments received on the DEIS, which plaintiffs assert was
not legally adequate.  (RSUF ¶ 15).

In September 2005, the Forest Service issued a record of
decision (ROD) and final EIS ("FEIS") approving the Project.
(PSUF ¶ 15; DSUF ¶ 16).  The FEIS considered fourteen
alternatives to address the enumerated purpose and need[2] of the
Project; three studies were considered in detail, while eleven
were considered but eliminated from detailed study.[3]  (DSUF ¶

_____

[2]     The stated purpose and need of the Project in the FEIS
is as follows:

1.    Implementation of the Herger-Feinstein Quincy Library
      Group ("HFQLG") Act , which requires the construction
      of a network of DFPZs, group-selection timber harvest,
      and individual tree selection (area thinning);
2.    Implementation of a DFPZ as part of an extensive fuel
      treatment network that is effective in reducing the
      potential size of wildfires, and providing safe
      locations for fire suppression personnel in the event
      of a wildfire;
3.    Implementation of individual tree selection (area
      thinning) to promote forest health and provide an
      uneven-aged structure to forested stands;
4.    Implement of group selection as directed in the 1998
      HFQLG Act to achieve desired future condition of all-
      age, multistory, fire-resilient forests while
      contributing to the local economy though a sustainable
      output of forest products;
5.    Implementation of economically efficient treatments to
      reduce hazardous fuels and to contribute to community
      stability; and
6.    Providing the necessary access for the construction of
      the DFPZs, group-selection timber harvest, and area
      thinning, and to reduce impacts on the transportation
      system.

(Creeks Forest Health Recovery Project FEIS ("FEIS") provided in
the Creeks Forest Health Recovery Project Administrative Record
(CR), filed April 20, 2006, at 01867-68).

[3]     Plaintiffs dispute that the Forest Service adequately
                                              (continued...)

7

17).  The FEIS analyzed in detail a new alternative, Alternative 14, which differs in only minor respects from Alternative 1, the proposed action in the DEIS.  (PSUF ¶ 15).  The FEIS failed to consider in detail any alternative other then Alternative 14, Alternative 1, and no action.  (PSUF ¶ 15).

On September 9, 2005, Forest Supervisor Laurie Tippin signed the record of decision (ROD) for the Project.  The ROD implements Alternative 14, as described in the FEIS, and sets forth the rationale for the decision.  (DSUF ¶ 19).

In November 2005, plaintiffs appealed the Project decision. (DSUF ¶ 20; PSUF ¶ 17).  By letter dated December 19, 2005, the Appeal Deciding Officer denied the appeals and affirmed the Forest Supervisor's decision to approve the Project.  (DSUF ¶ 21; PSUF ¶ 17).  This decision constituted the final administrative determination of the Department of Agriculture.  (PSUF ¶ 17).  In January 2006, the Forest Service awarded three of four timber sale contracts implementing the Creeks Project to Sierra Pacific Industries.[4]  (DSUF ¶ 22).

---

[3](...continued)
considered reasonable alternatives.  (DSUF ¶ 17).

[4]    On April 6, 2006, Sierra Pacific Industries ("SPI") moved to intervene as a defendant in this matter.  On May 15, 2006, the court granted SPI's motion to intervene only as to the remedial issues in this case.  (Mem. & Order, filed May 15, 2006, Docket No. 23).  However, on June 26, 2006, defendant-intervenor SPI filed a 16-page brief, primarily addressing the merits of plaintiffs' claims.  Because SPI's role in this case is limited, the court will not consider SPI's briefing on issues relating to the merits of the claim.  However, the court will consider SPI's arguments that relate to the injunctive relief sought by plaintiff, which are set forth in large part on pages 15-16.

1    On February 17, 2006, plaintiffs filed this lawsuit
2  challenging the Project and seeking to have the Project set
3  aside.  The parties agrees that "no logging or other ground
4  disturbing activities will occur to implement the Creeks Project
5  until 14 days after this Court issues a final judgment."  (DSUF ¶
6  22; PSUF ¶ 17).  Plaintiffs assert that defendants' decision to
7  approve the project is contrary to NEPA because the FEIS failed
8  to consider reasonable alternatives and failed to take a hard
9  look at significant environmental issues.  Plaintiffs also assert
10 that the implementation of the Project violates NFMA because (1)
11 the conclusion that the Project will insure the viability and
12 distribution of old forest wildlife is based upon flawed analysis
13 and insufficient evidence and (2) the Forest Service failed to
14 obtain and analyze required wildlife monitoring data prior to
15 approving the Project.  Defendants contend that the Project,
16 including the FEIS, fully complies with NEPA and NFMA.

17                          **STANDARD OF REVIEW**
18 **A.   Summary Judgment**

19    The Federal Rules of Civil Procedure provide for summary
20 adjudication when "the pleadings, depositions, answers to
21 interrogatories, and admissions on file, together with
22 affidavits, if any, show that there is no genuine issue as to any
23 material fact and that the moving party is entitled to a judgment
24 as a matter of law."  Fed. R. Civ. P. 56(c).

25    In considering a motion for summary judgment, the court must
26 examine all the evidence in the light most favorable to the
27 non-moving party.  United States v. Diebold, Inc., 369 U.S. 654,
28 655 (1962).  If the moving party does not bear the burden of

                                   9

1  proof at trial, he or she may discharge his burden of showing

2  that no genuine issue of material fact remains by demonstrating

3  that "there is an absence of evidence to support the non-moving

4  party's case." Celotex Corp. v. Catret, 477 U.S. 317, 325

5  (1986).  Once the moving party meets the requirements of Rule 56

6  by showing there is an absence of evidence to support the

7  non-moving party's case, the burden shifts to the party resisting

8  the motion, who "must set forth specific facts showing that there

9  is a genuine issue for trial." Anderson v. Liberty Lobby, Inc.,

10 477 U.S. 242, 256 (1986). Genuine factual issues must exist that

11 "can be resolved only by a finder of fact, because they may

12 reasonably be resolved in favor of either party." Id. at 250.

13     Where as here, the court's review is limited to the

14 administrative record, stipulated to by the parties, there are no

15 triable issues of fact, and summary judgment is appropriate. See

16 Northwest Motorcycle Ass'n v. U.S. Dept. of Agriculture, 18 F.3d

17 1468 (9th Cir. 1994).

18 **B.   Administrative Procedures Act**

19     Under the Administrative Procedures Act ("APA"), the court

20 may set aside a final agency action only where the action is

21 "arbitrary, capricious, an abuse of discretion, or not otherwise

22 in accordance with the law." 5 U.S.C. § 706.  Review under the

23 APA is "searching and careful." Ocean Advocates v. United States

24 Army Corps of Eng'rs, 361 F.3d 1108, 1118 (9th Cir. 2004).

25 However, the court may not substitute its own judgment for that

26 of the agency. Id. (citing Citizens to Preserve Overton Park,

27 Inc. v. Volpe, 401 U.S. 402 (1971), overruled on other grounds by

28 Califano v. Sanders, 430 U.S. 99 (1977).  In short, the court

must ensure that the agency has taken a hard look at the environmental consequences of its proposed action. <u>Oregon Natural Resources Council v. Lowe</u>, 109 F.3d 521, 526 (9th Cir. 1997). As part of this inquiry, the court should ask "whether the [] decision was based on a consideration of the relevant factors and whether there has been a clear error in judgment." <u>Ocean Advocates</u>, 361 F.3d at 1118. In addition, the court determines "whether the agency articulated a rational connection between the facts found and the choice made." <u>Id.</u> at 1118-1119 (quoting <u>Arizona Cattle Growers' Ass'n v. United States Fish and Wildlife Serv.</u>, 273 F.3d 1229, 1236 (9th Cir. 2001).

**ANALYSIS**

Plaintiffs challenge defendants' decision to implement Alternative 14 of the Creeks Forest Health Recovery Project on the basis that this decision violates the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, and the National Forest Management Act ("NFMA"), 16 U.S.C. § 1604.

**I.   National Environmental Policy Act (NEPA)**

NEPA mandates that federal agencies prepare a detailed Environmental Impact Statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(c). These statements must include a description and analysis of the environmental impact of the proposed action, any adverse environmental effects that cannot be avoided if the action is implemented, alternatives to the proposed action, the relationship between short-term uses and long-term productivity, and any irreversible or irretrievable commitment of resources that would be involved is the action were

11

to be implemented.  Earth Island Inst. v. U.S. Forest Serv., 442
F.3d 1147, 1153 (9th Cir. 2006) (citing 42 U.S.C. § 4332(2)(c)).
"In short, NEPA requires that a federal agency 'consider every
significant aspect of the environmental impact of a proposed
action' and 'inform the public that it has indeed considered
environmental concerns in its decisionmaking process.'"  Id.
(quoting Kern v. U.S. Bureau of Land Mgmt., 284 F.3d 1062, 1066
(9th Cir. 2002)).

### A.   Failure to Analyze an Adequate Range of Alternatives[5]

Plaintiffs also challenge the adequacy of the FEIS,
asserting that it failed to address an adequate range of
alternatives.  NEPA mandates that an agency consider and discuss
the range of all reasonable alternatives to the proposed action,
to "provid[e] a clear basis for choice among options by the
decisionmaker and the public."  40 C.F.R. § 1502.14.  An agency
is not required to extensively analyze alternatives that do not
meet the purpose and need of the Project.  Laguna Greenbelt, Inc.
v. United States Dept. of Trans., 42 F.3d 517, 523-525 (9th Cir.
1994).  Nor, however, can the agency narrowly define its purpose
and need so as to winnow down the alternatives until only the
desired one survives.  See Muckleshoot Indian Tribe v. United
States Forest Serv., 177 F.3d 800, 814 n. 7 (9th Cir. 1999)

---

[5]     Plaintiffs also assert that the FEIS failed to take a
hard look at fire and fuels issues and to disclose and respond to
contrary scientific information and opinion.  Many of the
arguments that plaintiffs set forth in support of that assertion
overlap with the arguments made in support of the assertion that
defendants did not adequately analyze the range of reasonable
alternatives.  As such, and for the reasons set forth herein, the
court does not separately analyze plaintiffs' assertion that
defendants failed to take a hard look at fire and fuels issues.

(noting that, in the EIS context, "[o]ne obvious way for an agency to slip past the strictures of NEPA is to contrive a purpose and need so slender as to define competing reasonable alternatives out of consideration. . . .").

Here, the Forest Service evaluated three action alternatives in detail: (1) no action, (2) Alternative 1, and (3) Alternative 14, which differs only in minor respects from Alternative 1 in order to address connectivity concerns that may affect the viability of the American marten.  (CR 01869)  The two alternatives analyzed by the Forest Service are nearly identical, as is evidenced by the fact that the Forest Service analyzes them in tandem throughout most of the FEIS.  (See, e.g., CR 01892-01912; 01916-01920)  Both proposals contain identical quantities of DFPZs and area thinning.  Alternative 14, however, provides that 612 acres of DFPZ would be treated with Prescription E, which would leave small "leave islands" up to 1/4 acre in size untreated over approximately 20% of the treatment unites to provide a greater component of small sized trees and stand heterogeneity.  The similarity between the two action alternatives raises concern that the Forest Service may not have taken the requisite hard look.  (Compare CR 01929 with CR 01955; compare CR 01933 with CR 01956; compare CR 01936 with CR 01957).[6]

Plaintiffs assert that defendants should have considered, in detail, alternatives involving less intensive logging.

---

[6]     These citations are set forth as examples of the similarities between the alternatives as illustrated by charts which describe the effect of each alternative's techniques on treated stands within the Project area.  These examples by no means exhaust the examples of similarities between the alternatives set forth in the FEIS.

1  Specifically, plaintiffs assert that defendants should have

2  considered (1) at least one option that retained higher canopy

3  cover (e.g., 50%, rather than 30-40%); (2) at least one option

4  that did not direct logging of medium and large trees (e.g.,

5  trees larger than 12-20" diameter, rather than 30" diameter); and

6  (3) at least one option based upon the 2001 Framework.

7  Defendants respond that while certain fuel reduction goals of the

8  project may be met be plaintiffs' proposed alternatives, other

9  important goals of the project would not be met, such as

10 providing a safe place for fire-fighting personnel from which to

11 fight wildfire, and improving forest health and economic

12 efficiency.[7]

13                    **1.   Canopy Cover**

14     Plaintiffs assert that numerous commenters on the DEIS,

15 including experts in fire ecology and wildlife biology,[8] argued

16

17     [7]   At oral argument, defendants also relied heavily on the
fact that the Project FEIS "tiers" to the 2004 Framework FEIS.
18 However, while the court acknowledges that this tiering approach
is generally acceptable, 40 C.F.R. § 1508.28, the ROD
19 implementing the 2004 Supplement provides that "[s]ite-specific
decisions will be made on projects in compliance with NEPA, ESA,
20 and other environmental laws following applicable public
involvement and administrative appeal procedures." CR 00124, at
21 20; see Earth Island, 442 F.3d at 1154. Further, site-specific
analysis and decisions are referred to consistently throughout
22 the ROD in the area of species conservation as well as in
relation to less-intensive logging measures. See e.g., CR 00124,
23 at 9-11, 17, 27.

24     [8]   For example, Dr. Dennis Odion, a fire ecologist at the
University of California, Santa Barbara, concluded that fuels
25 reduction goals can be met by logging only small trees and by
retaining greater canopy cover. CR 01836; see also 01830-32.
26 While an appendix to the FEIS quotes his comments, neither the
appendix nor the text of the FEIS discusses the basis for his
27 scientific opinion or responds to the scientific information
provided. See Sierra Club v. Eubanks, 335 F. Supp. 2d 1070, 1078
28 (E.D. Cal. 2004) (finding that despite disclosure of expert
                                        (continued...)

1    that the Forest Service's fuels objectives can be met with less

2    adverse impacts to old forest wildlife by retaining higher canopy

3    cover and urged that the Forest Service to consider such an

4    alternative in the EIS.  However, in the FEIS, any alternatives

5    that provided for retaining more canopy closure was rejected.

6    The Forest Service's stated reasons were that "the alternative

7    does not meet Purpose and Need Statements 1 through 3," (CR

8    01913), and that to reduce canopy closure "any further would

9    compromise the effectiveness of the DFPZs," (CR 01914).  The

10   Forest Service provided no further explanation as to why canopy

11   closure would not meet the Purpose and Need statements or why

12   reduction would compromise the effectiveness of DFPZs.

13        In their briefing, defendants assert that plaintiffs'

14   suggested canopy cover limits would prevent the Forest Service

15   from accomplishing its goal of promoting forest health because

16   high stand densities force individual trees to compete for

17   resources and are at risk for insect and disease outbreaks.  As

18   an initial matter, this justification was not listed by the

19   Forest Service as a reason for rejecting the alternatives calling

20   for greater retention.  See Motor Vehichle Mfrs. Ass'n of U.S.,

21   Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 50 (1983)

22   ("It is well established that an agency's action must be upheld,

23   if at all, on the basis articulated by the agency itself.").  To

24   support their argument, defendants point to a number of pages in

25

26        [8](...continued)
     comments and conclusions, including one from Dr. Odion, the
27   Forest Service failed to take a hard look because there was "no
     indication that any views [] expressed contrary to the logging
28   proposed by the [project] were duly weighed").

15

the FEIS, none of which were cited to or referenced in the FEIS
as an explanation why the alternatives were summarily dismissed
without detailed analysis.  This runs contrary to the public
disclosure purpose of NEPA, which requires that "the public
receive the underlying environmental data from which a Forest
Service expert derived her opinion."  Ecology Center v. Austin,
430 F.3d 1057, 1067-68 (9th Cir. 2005) (quoting Idaho Sporting
Cong., 137 F.3d at 1150) (holding that the Forest Service
violated NEPA by failing "to either adequately explain its impact
assessment or provide the information that is necessary to
understand and evaluate the Forest Service's decision"); see also
Earth Island, 442 F.3d at 1159 (quoting Native Ecosystems Council
v. U.S. Forest Serv., 418 F.3d 953, 960 (9th Cir. 2005) (holding
that a review of the adequacy of an FEIS's hard look includes "a
pragmatic judgment whether the [FEIS's] form, content, and
preparation foster both informed decision-making and *informed
public participation*") (emphasis added).

     Further, defendants citations to the administrative record
do not fully support their proposition.  Defendants argue that
maintaining 50% canopy cover would result in excess crown bulk
density.  However, plaintiffs point to evidence in the record
that stands logged to 50% canopy cover would on average result in
49% of maximum stand density after logging, CR 00858, which is
within the range of "desirable stand densities," CR 01883.  In
response, defendants point to evidence that thinning to 50%
canopy cover would retain undesirably high stand densities on
modeled stands.  CR 00861.  Given these conflicting conclusions
that could be reached based upon the agency's own findings, how

can the Forest Service justify that "it was immediately clear" that the proposed alternatives retaining higher canopy cover would inhibit the goal of promoting a healthy forest?  The Forest Service offers no explanation for this conclusion.

Finally, defendants' arguments only address the alleged insufficiencies of retaining 50% canopy cover, but do not address why alternatives were not considered that retained higher canopy cover than Alternatives 1 or 14, but less than 50%.  The Forest Service again offers no explanation for the failure to do so.

In light of the above deficiencies, the court finds that defendants have simply failed to adequately explain why the goal of "forest health" justifies the wholesale rejection of all alternatives involving retaining higher canopy cover.

### 2.   12-20" dbh Limit

Plaintiffs also assert that various commenters and experts argued that the Forest Service's fuel objective could be met by less intensive logging which would not log medium and large trees (trees 12-20" dbh).[9]  However, in the FEIS, any alternatives that provided for retaining medium and large trees was rejected.  The Forest Service's stated reasons were that "the alternative does not meet Purpose and Need Statements."  (CR 01912-13).  The Forest Service provided no further explanation.

---

[9]     For example, Chad Hanson, a Ph.D student at the University of California, Davis with a research focus on fire ecology in forest ecosystems, cited specific research which demonstrates that severe fire could be prevented by logging only trees 8-10" in diameter.  CR 01697-99.  While an appendix to the FEIS quotes his comments, neither the appendix nor the text of the FEIS discusses the basis for his scientific opinion or responds to the scientific information provided.  See Sierra Club, 335 F. Supp. 2d at 1078.

1   In their briefing,[10] defendants assert that setting a 12"

2   dbh limit or 20" dbh limit would make it difficult to implement

3   the project in a cost-effective manner.  In support of this

4   assertion, defendants point to the 2004 SNFPA, which modified the

5   2001 SNFPA to "improve the cost-effectiveness of treatments."  CR

6   124, at 9; CR 124, at 91 ("[E]xisting diameter limit restrictions

7   have significantly reduced managers' ability to design and

8   implement cost-efficient fuels treatments.").  Yet nowhere in the

9   FEIS does the Forest Service provide any analysis regarding the

10  cost-effectiveness of each of the various alternative approaches.

11  Rather, the Forest Service simply dismissed out of hand without a

12  reasoned explanation any proposal which would have called for a

13  lower diameter limit.  This does not constitute a hard look at

14  reasonable alternatives.  See Klamath-Siskiyou Wildlands Ctr. v.

15  U.S. Forest Serv., 373 F. Supp. 2d 1069, 1089-90 (E.D. Cal.

16  2004).

17          **3.   2001 Framework**

18  Finally, plaintiffs assert that defendants should have

19  analyzed in detail an alternative that implements the 2001

20  Framework.  Experts, including Dr. Tom Kucera, an expert cited by

21  the Forest Service in the FEIS, stated that this would be an

22  "obvious alternative that should be analyzed" because "[s]uch an

23  alternative would have a much less adverse impact on marten

24  populations and habitat connectivity while meeting the project's

25  purpose and need."  CR 01775.  In response, the FEIS states that

26  _____

27          [10]   Because defendants failed to include these reasons in
    the FEIS, these explanations suffer from the same problems as
28  those relating to canopy cover.  See Motor Vehicle Mfrs. Ass'n
    of U.S., Inc., 463 U.S. at 50.

"[t]he 2004 SNFPA ROD has superceded the 2001 SNFPA ROD. . . . This alternative would not be consistent with the 1993 Lassen LRMP, as amended by the 2004 SNFPA ROD."  CR 01912.

To the extent that defendants assert that the 2004 Framework supercedes the 2001 Framework such that implementation of a plan in accordance with the 2001 Framework would be inconsistent with the 2004 Framework, they are mistaken.  The 2004 Framework amended the 2001 Framework to provide the Forest Service with increased flexibility, but *did not mandate* more intensive logging measures.  CR 00119-20 (setting more flexible maximum guidelines for logging, but not mandating minimum requirements).  Further, the U.S. Environmental Protection Agency ("EPA"), in its scoping comments on a similar project in the Sierra Nevada, recommended that the Forest Service include a comparison of the 2001 Framework and the 2004 Framework as well as an evaluation of an alternative which would implement the 2001 Framework in the environmental documentation.  CR Supp. 05215.  The stated reason for these recommendations was the "on-going public debate . . . regarding the scientific basis for; the fuel management, environmental, and social benefits of; and the adverse effect associated with the 2004 [Framework] versus the [2001 Framework]."  CR Supp. 05215.  As such, an alternative applying the 2001 Framework would not necessarily be inconsistent with the 2004 Framework.

In their briefing, defendants argue that because the plaintiffs focus on the retention of canopy cover and the 12-20" dbh limit aspects of the 2001 Framework, this alternative is

19

merely a repackaging of plaintiffs previous two arguments.[11]   To

the extent that this argument has any merit, the court has found

that defendants failure to consider those alternatives violated

NEPA.

Accordingly, the court finds that the Forest Service

arbitrarily and capriciously failed to analyze an adequate range

of alternatives or to explain sufficiently why other alternatives

would not accomplish the Project's purpose and need.

### B.   Failure to Take a Hard Look at Environmental Impacts

NEPA does not contain substantive environmental standards

but instead establishes procedural requirements to ensure that

agencies take a hard look at the environmental impacts of their

actions.   Earth Island, 442 F.3d at 1154 (citing Kern, 284 F.3d

at 1066).   "A hard look includes 'considering all foreseeable

direct and indirect impacts.'"   Id. at 1159 (quoting Idaho

Sporting Cong. v. Rittenhouse, 305 F.3d 957, 973 (9th Cir.

2002)).   A hard look also includes "a discussion of adverse

impacts that does not improperly minimize negative side effects."

Id. at 1159 (citing Native Ecosystems Council v. U.S. Forest

Serv., 428 F.3d 1233, 1241 (9th Cir. 2005)).   The Forest Service,

therefore, must "undertake a thorough environmental analysis

before concluding that no significant environmental impact

exists."   Id. (citing Native Ecosystems, 428 F.3d at 1239).   In

reviewing the adequacy of an EIS, the Ninth Circuit applies the

"rule of reason" standard, "which requires 'a pragmatic judgment

---

[11]   Because defendants failed to include these reasons in
the FEIS, these explanations suffer from the same problems as
those relating to canopy cover and dbh limits.   See Motor
Vehichle Mfrs. Ass'n of U.S., Inc., 463 U.S. at 50.

whether the EIS's form, content and preparation foster both informed decision-making and informed public participation.'" Native Ecosystems, 418 F.3d at 960 (9th Cir. 2005) (quoting California v. Block, 690 F.2d 753, 761 (9th Cir. 1982)).

Pursuant to NEPA, "[a]gencies shall insure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements."  40 C.F.R. § 1502.24.  "Agencies have wide discretion in assessing scientific evidence, but they must 'take a hard look at the issues and respond to reasonable opposing viewpoints.'"  Earth Island, 442 F.3d at 1160.  An agency must be permitted discretion in relying on the reasonable opinion of its own qualified experts, even if the court might find contrary views more persuasive.  See Kleppe v. Sierra Club, 427 U.S. 390, 410 n.21 (1976).  However, NEPA does not permit an agency to rely on the conclusions and opinions without providing both supporting analysis and date.  Idaho Sporting Cong., 137 F.3d at 1150.  An agency must also evaluate and disclose credible scientific evidence that contraindicates a proposed action.  40 C.F.R. § 1502.9(b).

### 1.  American Marten

Plaintiffs contend that the FEIS fails adequately to analyze and disclose the project's likely adverse impacts to the American marten and its habitat.  Specifically, plaintiffs assert that the FEIS fails to disclose new research that indicates that the marten's population in the northern Sierra is far more precarious than assumed in the FEIS and that the FEIS fails adequately to analyze and disclose the project's adverse impacts to marten habitat, particularly habitat connectivity.

21

The FEIS provides that "marten appear to occupy much of its historic range in California particularly in the Sierra Nevada." CR 02047 (citing Kucera et al 1995).  However, Dr. Thomas Kucera, the same expert cited by the Forest Service, submitted comments on the DEIS and FEIS, asserting that "the statement in the FEIS is misleading and fails to recognize the marten's imperiled status in the area."  CR 03876.  Kucera relies on a 2005 peer reviewed paper by Forest Service carnivore expert Dr. William Zielinski[12] and an earlier 2004 paper by Zielinski that included similar information.  "The research concluded that the marten is a species 'with substantial changes in distribution,' including 'large gaps between contemporary detections that were not present historically' in the northern Sierra Nevada and southern Cascades."  CR 03876 (citing Zielinski 2004, Zielinski et al. 2005a).  The research also concludes that marten "populations in the southern Cascades and northern Sierra Nevada now appear discontinuous," CR 03876 (citing Zielinski et al. 2005a: 1394), and that "the apparent reduction in the range of the marten and other forest carnivores is most likely due to a combination of factors, including 'loss of mature forest habitat,'" CR 03876 (citing Zielinkski et al. 2005a: 1385-86).  Kucera summarizes that this research indicates that the marten's status in the northern Sierra Nevada is precarious.  CR 03876.  The FEIS fails to consider this research.

Pursuant to the Ninth Circuit's rule of reason standard, the FEIS's form, content and preparation should foster both informed

---

[12]    The FEIS also cites to previous research conducted by Dr. Zielinski in its analysis of the marten and fisher.

decision-making and informed public participation.  Native

Ecosystems, 418 F.3d at 960 (9th Cir. 2005).  Defendants, citing

CR 02047, argue that no new published data cited by plaintiffs

does not contradict the statement that the marten occupies most

of its historic range.[13]  However, the statement in the FEIS

would likely lead a reasonable person to believe that the marten

are not imperiled in the Sierra Nevada, specifically in light of

the absence of any reference to the 2004 or 2005 research

conducted by Zielinski.  As such, the FEIS does not foster

informed public participation.  This issue is also particularly

troubling because the expert cited by the Forest Service, Dr.

Kucera, maintains that the science relied upon is outdated and

the characterization is misleading.  CR 03876.

Defendants also contend that the FEIS analyzes ranger

district and Forest Survey records from within the Creeks project

area, sufficient to satisfy NEPA.  However, defendants have

excluded from their analysis any reference to the most recent

research conducted by the very experts whose past opinions they

relied upon in formulating the FEIS.  Further, the most current

research raises serious questions about the viability of the

---

[13]     Defendants also note that the paper cited to defendant
was published in August 2005, while the FEIS is dated September
14, 2005.  The implication that the agency does not have to
consider "eleventh-hour" research to comply with NEPA is without
merit.  Further, defendants do not address the 2004 research by
Zielinski that included similar information.

Zielinsky's 2004 research cited by plaintiffs is not
included in the administrative record.  As such, the court will
not examine the research itself.  However, the court will analyze
the research to the extent that it is referenced in Kucera's
comments to the FEIS, which is included in the administrative
record.

1   marten in the Project area.   See Seattle Audobon Soc. v. Espy,

2   998 F.2d 699, 704 (9th Cir. 1993) (finding that the Forest

3   Service failed to take a hard look for purposes of NEPA where it

4   did not address in any meaningful way a report that concluded the

5   spotted owl was declining more substantially and more quickly

6   than previously thought).   Therefore, because defendants failed

7   to address the most recent research regarding the viability of

8   the marten and because the exclusion of such reference is

9   misleading, defendants failed to take a hard look at the impact

10  of the project on the American marten and its habitat.

11      Plaintiffs also assert that defendants failed adequately to

12  analyze the impact of the project on habitat connectivity between

13  northern and southern marten populations.   The FEIS acknowledges

14  that Alternative 1 would negatively affect marten habitat

15  connectivity, CR 2054, but provides that Alternative 14 includes

16  a new DFPZ Prescription (Prescription E) which will maintain

17  north-south habitat connectivity, CR 2062-65.   Plaintiffs argue

18  that the FEIS is deficient because it fails to indicate where the

19  prescription will be applied and fails to provide any specific

20  information about the habitat quality.   The FEIS provides that:

21          Prescription E combines a higher retention of canopy
            (40-45% minimum) with untreated areas within 10% of the
22          stand and a higer retention of down logs (>12 inch
            small end diameter) to improve conditions for subnivean
23          foraging and provided sufficient cover.   These
            prescriptions were placed strategically to link the
24          areas of highest habitat quality.   This included areas
            within the former habitat management area, linking
25          areas to the south (Storrie Fire area) to the higher
            quality red fir and linkages from the Butt Creek
26          drainage north to the higher quality habitat identified
            in Alternative 1.   This alternative also maintains
27          existing linkages to the north and west within the
            former HMA.

28

CR 02062.

However, while the FEIS acknowledges that the Project would create consequences to marten habitat connectivity, the Forest Service failed to analyze Zielinsky's research from both 2004 and 2005.  Zielinksy's 2005 report includes a map of marten habitat in the Sierra Nevada's, demonstrating that most of the treatments in the Project area overlap with areas determined to have moderate habitat suitability for marten.  CR 03898, 03903.  The map also illustrates that the Project occurs within the area directly between two areas of high quality marten habitat and includes the best habitat between those areas.  CR 3903.  As such, the research and expert analysis demonstrates that the Project area likely plays an important role in ensuring north-south habitat connectivity for marten and reducing the possibility that marten populations to the north and south will become isolated from one another.  CR 3903.  While Zielinsky's 2005 study is included in the administrative record in this case, along with analysis and comments by an expert,[14] there is no indication that this information was duly weighed in the FEIS.  See Sierra Club v. Eubanks, 335 F. Supp. 2d 1070, 1078-79 (E.D. Cal. 2004).

The FEIS acknowledges that limits to the scientific information available relating to the marten.  CR 02047.  Because the Forest Service failed to analyze and evaluate the most recent

---

[14]    Dr. Susan Britting, a biological consultant with a Ph.D. in Biology from University of California, Los Angeles, submitted a report establishing the overlap between the Project and areas identifies by Zielinkski in his 2005 research as important to fisher and marten conservation.  CR 03900-04.

scientific information on the marten, which was prepared by a
leading Forest Service expert and that offered more detailed
information relating to habitat connectivity issues implicated by
the Project, the court cannot find that the Forest Service
sufficiently evaluated the effects of the Project on habitat
connectivity.  See Seattle Audobon Soc'y, 998 F.2d at 704 ("If
[the project] is based on an incomplete NEPA analysis of the
consequences continued logging will have on . . . old growth
dependant species' viability over both the short and long term,
there will be a gap in planning that cannot be closed.").
Therefore, the court finds that the Forest Service abused its
discretion in failing to disclose and analyze this information
and thus, failed to take a hard look at the impact of the Project
on marten habitat connectivity as required by NEPA.

### 2.   Pacific Fisher

Plaintiffs contend that the FEIS entirely failed to consider
the project's impacts on the Pacific fisher and its habitat.
Specifically, plaintiffs object to the finding in the FEIS that
"the project area provides little or no habitat potential for
this species therefore the project would have little or no affect
on the totality of habitat within its former range."  CR 02049.
Plaintiffs assert that this conclusion is flatly inconsistent
with a recent analysis by leading Forest Service researchers,
specifically Zielinski, that indicates that the project area
provides moderate to moderately-high potential habitat for the
fisher.  CR 03902.  Defendants contend that Forest Service's

26

conclusions regarding fisher are well-founded.[15]  Specifically,

defendants assert that the conclusion is supported by: (1) the

absence of some vegetative components favored by fisher; (2)

higher elevations of the project areas and deep winter snow packs

that persist for long periods; and (3) overlap with marten.  CR

02048-49.

While defendants could have disclosed and examined the

recent research by Zielinski in the FEIS but chose not to, the

failure to do so was not an abuse of discretion.  The research by

Zielinski referenced by plaintiffs was an exercise "designed to

identify general areas of for consideration" for fisher

conservation and reintroduction.  CR 03894.  However, Zielinski's

research also provides that

> Regional marten habitat connectivity should also be
> considered in selecting fisher conservation areas.  For
> example, if the Plumas County candidate site is used as
> a fisher reintroduction location it would appear to be
> more disruptive to the goal of martens maintaining
> north-south continuity between the Sierra Nevada and
> the Cascades.

CR 03894.  Further, Zielinski's research indicates that "[t]he

literature is replete with references to the potential for

negative competitive interactions between the [] fisher and the

[] marten, usually with the martens suffering from the

interaction."  CR 03890.  Because Zielinski's research states

that sites such as the Project area may not be suitable for

---

[15]    Defendants also contend that the predictive habitat
model relied upon by plaintiffs was not available during the
Project's analysis and the utility and accuracy of the research
remains unknown.  However, the research by Dr. Zielinksi, a
Forest Service expert relied upon throughout the FEIS for his
research on marten and fisher, is dated June 27, 2005, CR 03890,
whereas the Project was not approved until September 9, 2005.  As
such, the court finds this argument unavailing.

fisher conservation or reintroduction due to the overlap with marten and areas dedicated to maintaining habitat connectivity for the marten, this research is not inconsistent with the Forest Service's conclusions set forth in the FEIS that the Project would not impact fisher habitat due to overlap with the marten.

Plaintiffs also assert that the FEIS failed to take a hard look at the impact of the project on the fisher because the Forest Service's conclusion is based upon the incorrect premise that "fisher do not appear to overlap with marten." Plaintiffs contend that this conclusion is inconsistent with research from the Sierra Nevada and elsewhere documenting that fisher and marten can and do occur in the same area. CR 3879-80. However, the FEIS acknowledges that "marten and fisher occasionally occupy the same areas," but notes that "in general there is very little overlap of fisher sighting with those of marten." CR 02048. Therefore, plaintiffs' contention that the Forest Service relied upon an incorrect premise is erroneous.

The conclusion in the FEIS that the project area would not impact fisher habitat is not premised on the conclusion that fishers and martens cannot co-exist, but rather because of the overlap between fisher and marten. Further, the recent Zielinski research is not inconsistent with this conclusion. Thus, despite defendants' failure to analyze this data, the FEIS took the necessary hard look at the Project's impact on the Pacific fisher and its habitat.

### 3.   California Spotted Owl

Plaintiffs contend that the FEIS fails adequately to analyze and disclose the project's likely adverse impacts to the

28

California spotted owl and its habitat.  At the outset,
plaintiffs contend that the FEIS underestimates the owl's
imperiled status in the project area.  The EIS cites a 2003
analysis of owl population trends to support the conclusion that
spotted owl populations "are either stable or only slightly
declining."  CR 02012.  However, plaintiffs point to the comments
and statistics submitted by Dr. Jennifer Blakesly,[16] an expert
relied upon in the FEIS for her studies relating to the
California spotted owl, that demonstrate that the number of
territories within the Project area occupied by resident spotted
owls has declined from 11 in 1992 to 5-6 in 2002-2004.  CR 03906.
Blakesly describes this as an "alarming decline in the number of
owls within the Creeks project area."  CR 03906.  However, the
FEIS does not evaluate this information in the FEIS.

Plaintiffs also attack the Project's reliance on the minimum
threshold requirements for suitable habitat for the owl.
Defendants argue that in all but two of the nest core areas
within or adjacent to the Project area, the Project will maintain
suitable habitat above the 50% threshold suggested by plaintiffs.
However, defendants confuse the threshold minimums applied to owl
nest core areas and owl home ranges.

With respect to owl home ranges - which are 4500 acre areas
surrounding the activity center - plaintiffs assert that the FEIS
inexplicably waters down a 50% standard and instead bases it
analysis on the assumption that 30% habitat within each home

---

[16]   Dr. Jennifer Blakesly, holding a Ph.D. in Wildlife
Biology from Colorado State University, has conducted research on
northern and California spotted owls over the past 17 years.  CR
03905.

1  range is "the minimum threshold."  Defendants rely on a study

2  which sets a threshold of 30% to 50% suitable habitat in home

3  ranges to ensure long-term viability.  CR 02022.  Plaintiffs

4  contend that this same study was referenced in the 1999 QLG FEIS,

5  but in that case, a 50% minimum was used and therefore, to the

6  extent that defendants seek to use a lower threshold, it is

7  changing its methodology and needs to provide a rational

8  explanation for its change.  See Native Ecosystems, 418 F.3d at

9  964.  However, the Forest Service has not changed its underlying

10  methodology.  The Forest Service continues to rely on the study

11  which sets a minimum percentage somewhere in the range of 30%-

12  50%.  The Forest Service's decision to use a 30% minimum in this

13  Project as opposed to a 50% minimum is not inconsistent with the

14  underlying study relied upon in the FEIS and does not require

15  further explanation.

16      However, the Forest Service's discretion to use a 30%

17  threshold for owl home ranges does not resolve the issue of the

18  minimum thresholds applied to *owl nest core areas*.  With respect

19  to owl nest core areas – which are 500 acre areas surrounding the

20  activity center – the FEIS states that "Blakesly's data indicates

21  that 50% habitat within the core area is an important threshold."

22  CR 02022.  However, in her comment to the FEIS, Blakesly states

23  that "[t]his statement is completely erroneous."  CR 03905.

24  Blakesly contends that her research has never indicated that

25  there is such a "critical threshold."  CR 03905.  Further,

26  Blakesly provides that her data indicates that 83% suitable

27  habitat within nest core area is a reasonable minimum target, and

28  that anything less than 71% should be unacceptable as a

30

management target.  CR 03905.  There is no indication that the

Forest Service responded or weighed these comments.  This is

particularly troubling where the expert, upon whose data the

Forest Service relies, submits that the Forest Service is

misinterpreting that data and that the conclusions reached by the

Forest Service are not supported by that data.  Nor does the

Forest Service cite any other experts for its interpretation of

Blakesly's data.  CR 02022.  Therefore, without offering a

rational explanation for its conclusion that Blakesly's data

supports a 50% minimum threshold for owl nest core areas and

without a discussion of Blakesley's assertion that the Forest

Service misstated and misapplied her data, the court cannot find

that the Forest Service took the requisite hard look at the

Project's affect on the California spotted owl's habitat.

### 4.   Pileated Woodpecker

Plaintiffs contend that the FEIS overlooked the Project's

impact on the pileated woodpecker and its habitat.  Specifically,

plaintiffs assert that the FEIS fails to offer a rational

explanation for its conclusion that the Creeks projects would

have no effect on the pileated woodpecker, despite the logging of

large snags and the reduction of future recruitment of such

snags.  Defendants contend that a wide range of recent research

was used to develop the conclusions in the FEIS[17] and that while

plaintiffs may disagree with the conclusions reached, the agency

---

[17]    Defendants cite: (1) Bull, E., 2005 Study of the
effects of thinning on Pileated Woodpecker (CR 02654), (2)
Robinson and Alexander, 2002 - Habitat Descriptions (CR 03441),
(3) Sauer et al. 1999 - Population trends (CR 03494), and (4)
local distribution data specific to the Lassen area (CR 02736).

1  was within its discretion to adopt the research and findings of
2  its experts.

3      The FEIS acknowledges that the "current snag densities are
4  below the Forest Guidelines" and that "there would be a general
5  reduction in the number of snags within the areas treated."  CR
6  02006, 02008.  However, the FEIS predicts that after the initial
7  small drop in the overall percentage, snags and snag numbers
8  "would continue to increase within the project area due to
9  natural recruitment process."  CR 02008.  The FEIS also predicts
10 that "down wood material are expected to increase within the
11 project area over time" and that "large wood recruitment [] would
12 increase due to project activities."  CR 02008.  In analyzing the
13 Project's impact on the pileated woodpecker, the FEIS again
14 states that most lands within the project area would not meet the
15 criteria for high or moderate quality habitat "due to the snag
16 densities and age and size class of the stands."  CR 02081.  To
17 the extent that there are lands that would meet fall into the
18 moderate to high quality suitability category, the Forest Service
19 relied upon a 2005 study by Bull, which concluded "that fuels
20 reduction projects do not necessarily preclude use by pileated
21 woodpecker, if sufficient down wood and snags are retained."  CR
22 02082.  The Forest Service concluded that "[b]ased upon the data
23 supplies, the snag and down log retention guidelines are expected
24 to retain sufficient foraging substrates as described by Bull."
25 CR 02082.

26     Plaintiffs argue that a recent study on landbirds in the
27 Lassen area, commissioned by the Forest Service, recommended that
28 "as many snags as possible" be retained, with an "absolute

minimum" of 4 snags/acre with "priority given to the largest ones." CR 5270.  However, the FEIS does address the issue of maintaining minimum snag requirements, but concludes that "it is more important to ensure that a landscape has continual snag replacement as opposed to direction that requires a set number of snags within a given area." CR 02008.

Therefore, because defendants' conclusion that the Project would not affect the pileated woodpecker is supported by expert studies, and because defendants' considered a minimum snag requirement (although ultimately rejecting it), the FEIS took the requisite hard look at the Project's impact on the pileated woodpecker.

## II.  National Forest Management Act

Plaintiffs also seek a declaration that the Project violates the National Forest Management Act in that it is inconsistent with the Lassen LRMP, as amended.  As an initial matter, the parties dispute which regulations apply to the Project. Defendants assert that the 1982 regulations do not apply because these regulations were repealed on January 5, 2005 and replaced by new planning regulations.[18]  While that is generally true, the Project continues to be governed by the 1982 regulations because the Lassen LRMP was prepared under the 1982 regulations,[19] and

---

[18]  While agencies are entitled to deference to their interpretation of their own regulations, Forest Guardians v. U.S. Forest Serv., 329 F.3d 1089, 1097 (9th Cir. 2003), that deference must give way when the agency's interpretation of its regulation runs counter to the governing statute.  See Auer v. Robbins, 519 U.S. 452, 457 (1997).

[19]  The Ninth Circuit has recently held that "NFMA
(continued...)

thus, those regulations continue to govern all management of the

Lassen National Park until a new LRMP is passed under the 2005

regulations.  Idaho Wildlife Fed'n v. Tower, No. CV 04-371, 2006

WL 988494, at *1 (D. Idaho Apr. 13, 2006) (citing Utah Envtl.

Cong. v. Bosworth, 439 F.3d 1184, 1191 (10th Cir. 2006) ("stating

that 1982 regulations extend beyond preparation of LRMP and

'continue [] throughout the [LRMP's] existence'")).  The Forest

Service cannot later dilute its obligations, including monitoring

designated management indicator species ("MIS"), "by passing new

regulations without also amending the LRMP that relied on the

greater obligations. . . . That would violate a cardinal

principle of NFMA that the management of an area be consistent

with its LRMP."  Id. (citing Ecology Center, Inc. v. Austin, 430

F.3d 1057 (9th Cir. 2005)).  Therefore, the court will apply the

1982 regulations.

### A.   Viable, Well Distributed Populations of Wildlife

Plaintiffs contend that the Project fails to insure viable,

well-distributed populations of the California spotted owl and

the American marten.  The regulations that applied when the

Forest Service adopted and amended the Lassen National Forest

plan require that:

> Fish and wildlife habitat shall be managed to maintain
> viable populations of existing native and desired non-
> native vertebrate species in the planning area.  For
> planning purposes, a viable population shall be
> regarded as one which has the estimated numbers and
> distribution of reproductive individuals to insure its
> continued existence is well distributed in the planning

---

[19](...continued)
regulations promulgated in 1982 apply to the 2001 Framework and
2004 Supplement."  Earth Island, 442 F.3d at 1173.

areas.  In order to insure that viable populations will
be maintained, habitat must be provided to support, at
least a minimum number of reproductive individuals and
that habitat must be well distributed so that those
reproductive individuals can interact with others in
the planning area.

36 C.F.R. § 219.19.  This regulation has been interpreted to
require that the Forest Service "ensure a proposed action will
not cause a loss of viability of an existing species."  Inland
Empire Public Lands Council v. United States Forest Service, 88
F.3d 754, 761 (9th Cir. 1996).  Further, the ROD implementing the
2004 Framework provides that management direction strategy is
"aimed at sustaining viable populations of at-risk species
associated with old-forest ecosystems well-distributed across
Sierra Nevada national forests."  CR 00082.

In this case, the Forest Service concluded that the Project
"may affect individuals, but is not likely to result in a trend
toward Federal listing or loss of viability" for the California
spotted owl or the American Marten.  CR 00752.  Defendants assert
that this finding is well supported in the Biological
Evaluation/Biological Assessment ("BE/BA") of the Project.  In
support of this assertion, defendants reassert the same arguments
that they made in relation to plaintiffs' claims that the Forest
Service failed to take a hard look at the Projects impact on the
owl and the marten in violation of NEPA.  As set forth above in
the court's analyses of this issue, defendants failed to take a
hard look at the effect of the Project on the marten, its
habitat, and habitat connectivity because the Forest Service
failed to evaluate the most current research on the marten.  Cf.
Inland Empire Pub. Lands Council. v. U.S. Forest Serv., 88 F.3d

35

754, 762 (9th Cir. 1996) ("We believe that an analysis that uses all the scientific data currently available is a sound one."). Also, as set forth above, defendants failed to take a hard look at the effect of the Project on the spotted owl through the failure to address conflicting information about the current status of the owl and through the failure to provide a rational explanation for the use of a 50% threshold for owl nest core areas.  Because the Forest Service failed to consider scientific data currently available in relation to the marten and failed to adequately explain its conclusions in relation to the spotted owl, the court cannot be reasonably certain that the Project – which the Forest Service concedes may harm individual martens and spotted owls - will not jeopardize the marten's and spotted owl's viability.  See Ecology Center v. Austin, 430 F. 3d 1057, 1068 (9th Cir. 2005) ("Because the Forest Service failed to provide the factual basis for its analysis and failed to adequately explain its decision, we cannot be reasonably certain that the salvaging . . . will not jeopardize . . . viability.").

### B.   Surveys of Management Indicator Species

According to plaintiffs, the Forest Service violated the NFMA's viability and diversity requirements by not conducting population surveys of Management Indicator Species ("MIS").  As set forth above, the NFMA regulations promulgated in 1982 apply to the 2001 Framework and 2004 Supplement.  See Earth Island, 442 F.3d at 1173.  These regulations require population monitoring.

See 36 C.F.R. § 219.[20]   "Because the 2001 Framework and 2004 Supplement were developed based on regulations in effect before November 9, 2000, transitional rules, not contained at 36 C.F.R. § 219.14, govern this case."   Earth Island, 442 F.3d at 1173-74. The applicable regulation provides:

> For units with plans developed, amended, or revised using the provisions of the planning rule in effect prior to November 9, 2000, the Responsible Official may comply with any obligations relating to management indicator species by considering data and analysis relating to habitat *unless the plan specifically requires population monitoring or population surveys for the species.*

36 C.F.R. § 219.14(f) (emphasis added); Earth Island, 442 F.3d at 1174.   Rather than monitor every species present within a project area, agencies may monitor the MIS, which act as proxies for all species within a species association, to determine whether the agencies are satisfying the NFMA's viability and diversity requirements.   Klamath-Siskiyou Wildlands Ctr. v. U.S. Forest Serv., 373 F. Supp. 2d 1069, 1089 (E.D. Cal. 2004).   "An MIS species is a bellwether, or class representative, "for other species that have the same special habitat needs of population characteristics."   Earth Island, 442 F.3d at 1173 (quoting Inland Empire Pub. Lands Council v. U.S. Forest Serv., 88 F.3d 754, 762 n.11 (9th Cir. 1996)).

---

[20]   36 C.F.R. § 219.19(a)(1) provides: "In order to estimate the effects of each alternative on fish and wildlife populations, certain vertebrate and/or invertebrate species present in the area shall be identified and selected as management indicator species and the reasons for their selection will be stated.   These species shall be selected because their population changes are believed to indicate the effects of management activities."

Appendix E to the 2001 Framework identifies certain species as MIS species, for which increased population monitoring is required, and this framework is incorporated into the 2004 Supplement. CR 00121 ("This Decision adopts the Monitoring Plan presented in Appendix E of the SNFPA FEIS."); Earth Island, 442 F.3d at 1173. The designated MIS listed in Appendix E include the pileated woodpecker and the black bear. The 2001 Framework requires "distribution" monitoring for these species, Id. at E-64, which is defined as data indicating "changes in the presence of species across a number of sample locations" which are designed to reveal "the status and change of populations" of the species. Id. at E-19. Appendix E to the 2001 Framework also provides that the Forest Service "will monitor the status and change in the geographic distribution of martens . . . . Monitoring the presence/absence of martens, across large areas that are differentially affected by treatments," was planned in order to "provide information that will inform future decisions about management." CR 42, Vol. 4, App. E at E-56. The Framework also states that "[b]ecause we do not yet have an empirical habitat model that can distinguish suitable from unsuitable habitat, it is necessary to monitor martens directly." Id.

As an initial matter, plaintiffs assert that the Ninth Circuit has held in almost identical circumstances that annual monitoring of MIS was required.[21] In Earth Island, the court analyzed the same 2001 Framework and 2004 Framework at issue in

---

[21]   Defendants vigorously contend that population monitoring is not required and that Earth Island was wrongly decided. However, the Forest Service's petition for rehearing en banc in that case was denied on July 12, 2006.

this case.  442 F.3d at 1175.  The plaintiffs in <u>Earth Island</u>
challenged the Forest Service's decision not to conduct
population monitoring of the hairy woodpecker and Williamson's
sapsucker.  <u>Id.</u>  Both of these species were listed as MIS in
Appendix E and were designated to be monitored in the form of
"distribution data."  <u>Id.</u>  The Ninth Circuit stated that "the
Framework expressly requires 'population monitoring,'
specifically in the form of 'distribution data'" and that "[i]t
is difficult to see how distribution data could effectively be
gathered in the absence of actual population monitoring."  The
court therefore rejected that Forest Service's argument that it
was under no obligation to determine population trends for the
two species at issue and held that the Forest Service's approval
and implementation of site-specific projects without appropriate
or sufficient population and habitat data is contrary to the NFMA
and governing provisions of the forest plan.  <u>Id.</u> at 1175-76.

In this case, Appendix E of the 2001 Framework, incorporated
into the 2004 Framework, requires "population monitoring" of both
the pileated woodpecker and the black bear in the form of
"distribution data."  Pursuant to the Ninth Circuit's decision in
<u>Earth Island</u>, the Forest Service has an obligation to determine
population trends for the pileated woodpecker and the black bear.
Likewise, because the 2001 Framework requires that the Forest
Service monitor the status and change of the American marten, and
provides even greater detail as to why and how the marten should
be monitored, the Forest Service has an obligation to determine
population trends for the American marten.
/////

1   Plaintiffs contest the Forest Service's decision not to
2   acquire annual monitoring and population trend data for the
3   marten, the pileated woodpecker, and the black bear, in
4   preparation for the Project.  Instead, the Forest Service
5   analyzed marten habitat as a proxy for marten population,
6   migratory monitoring information and Wildlife Service's Breeding
7   Bird Survey ("BBS") data as a proxy for woodpecker monitoring,
8   and California Fish and Game data as a proxy for bear monitoring.
9   Parties disagree as to whether the data evaluated by the Forest
10  Service is sufficient.  Plaintiffs assert that this information
11  is inadequate to satisfy defendants' obligations because "the
12  Forest Service has cobbled together bits and pieces of
13  information regarding the population or distribution of MIS,
14  gathered at different geographic scales and intensities and by
15  different agencies and organizations."  (Pls.' Opp'n, filed July
16  21, 2006, at 18-19).

17  The Ninth Circuit has interpreted 36 C.F.R. § 219.19(a) to
18  permit use of habitat as a proxy for population surveys in
19  certain circumstances.  Inland Empire, 88 F.3d at 761.  In Inland
20  Empire, the court confronted a challenge to the Forest Service's
21  proposed timber sale in the Kootenai National Forest  in
22  northwestern Montana.  In evaluating the effect of the Project on
23  species viability within the Project area, the Forest Service did
24  not conduct population surveys.  Rather, it "examined each
25  proposed alternative to see how many acres of each type of
26  relevant habitat would remain after timber was harvested," and
27  concluded that "a species would remain viable as long as the
28  threshold percentage of each type of habitat remaining in the

40

chosen alternative was greater than the percentage required for that species to survive." Id. at 759-760.  The court recognized that such an approach "necessarily assumes that maintaining the acreage of habitat necessary for survival would in fact assure a species' survival."  Id. at 761.  However, the court found the assumption "eminently reasonable" and concluded that the habitat analysis as a proxy for population surveys was not arbitrary and capricious.  Id.  Similarly, in Idaho Sporting Cong. v. Thomas, the Ninth Circuit upheld use of habitat as a proxy for population where the Forest Service performed further analysis that demonstrated the Project would result in "no appreciable habitat disturbance."  137 F.3d 1146, 1154 (9th Cir. 1998).

The Court confronted the proxy on proxy issue again in Idaho Sporting Congress, Inc. v. Rittenhouse, 305 F.3d 957 (9th Cir. 2002).  Distinguishing both Inland Empire and Thomas, the Rittenhouse Court held that use of habitat as a proxy was inappropriate in that case because the methodology used for monitoring habitat was unsound.  Id. at 972.  Specifically, the court noted that the Forest Service's methodology for identifying old growth habitat was demonstrably inaccurate and could not "reasonably ensure viable populations of the species at issue." Id.

### 1. American Marten

Plaintiffs argue that the Forest Service has failed to gather and analyze adequate monitoring data for the American marten.  The FEIS states that marten data was obtained by placing baited camera stations in a designated grid pattern and that twenty-three camera stations have been places in various

locations throughout the project area from 1996.  CR 02047.

However, the most recent survey work was completed in 2003.  CR

02047.  Further, the FEIS explicitly states that the

> [s]urveys only offer presence data and cannot provide
> any estimation of population numbers, reproductive
> success, or territorial data.  Therefore, assumptions
> on the status of the local population, other than to
> say that marten are present throughout the project
> boundary, cannot be made.

CR 02048.  Because the Framework requires that the Forest Service

"monitor the status and change in the geographic distribution of

martens," the statement in the FEIS that the data gathered and

analyzed by the Forest Service cannot provide population numbers,

reproductive success, territorial data, or even status of the

local population severely undermines the assertion that the

Forest Service adequately monitored the marten population.  Based

upon this lack of information, the Forest Service cannot

"reasonably ensure viable populations of the species at issue."

As such, the Forest Service failed to satisfy the requirements

for population monitoring for the American marten.

### 2.   Pileated Woodpecker

Plaintiffs also argue that the Forest Service has failed to

gather and analyze adequate monitoring data for the pileated

woodpecker.  Specifically, plaintiffs point to the section of the

FEIS which states that "[t]here is no local data on population

numbers."  CR 02090.

Defendants argue that the data for the pileated woodpecker

is sufficient to serve as a proxy for population monitoring

because the Forest Service relies on BBS data as well as landbird

monitoring being completed by the Point Reyes Bird Observatory

1   ("PRBO").  In regards to the sufficiency of the BBS data, the

2   Ninth Circuit has previously held that "BBS data alone cannot

3   satisfy the population monitoring requirement."  <u>Earth Island</u>,

4   442 F.3d at 1176.  In this case, the Forest Service's reliance on

5   BBS data is particularly problematic because the data tracks the

6   national population from 1966-1999.  CR 02080.[22]  In regards to

7   the sufficiency of the PRBO data, the information was derived

8   from 10 transects of various lengths within the proposed

9   treatment area from which point counts are taken and all birds

10  heard within 50 meters are noted.  CR 02068.  However, despite

11  this methodology and information acquired, the FEIS still

12  concedes that "[t]here is no local data on population numbers."

13  CR 02090.  As such, the court cannot conclude that the Forest

14  Service "reasonably ensure[d] viable populations" of the pileated

15  woodpecker.

16      Defendants also assert that the Forest Service perfomed a

17  detailed analysis of snags in the project area, a habitat

18  attribute essential for woodpeckers.  CR 02006-10.  However, the

19  pages of the FEIS cited by defendant discuss only the effect of

20  the project on "selected vegetative decadence," but do not

21  discuss its relationship to the pileated woodpecker.  Therefore,

22  the court cannot conclude that the analysis of snags performed by

23  the Forest Service adequately substituted for the required

24  population monitoring.  See <u>Earth Island</u>, 442 F.3d at 1175 ("It

25

26      [22]   When confronted with the Ninth Circuit's conclusion
    that BBS data was insufficient to meet the population monitoring
27  requirement in <u>Earth Island</u>, the defendants again asserted that
    they believed the case was wrongly decided.  However, this court
28  is not free to disregard Ninth Circuit precedent merely because
    defendants disagree with it.

1  is difficult to see how distribution data could effectively be
2  gathered in the absence of actual population monitoring.").

3          **3.    Black Bear**

4          Finally, plaintiffs argue that the Forest Service has failed
5  to gather and analyze adequate monitoring data for the black
6  bear.  Specifically, plaintiffs point to the section of the FEIS
7  that states that "little data is available on the current status
8  of the bear."  CR 02074

9          Defendants argue that the data analyzed relating to the
10  black bear is a sufficient proxy for population data because the
11  FEIS incorporates data from the California Department of Fish and
12  Game.  Specifically, the FEIS provides that "[p]resently the
13  statewide population *is believed* to be between 25,000 and 30,000"
14  in comparison to between 10,000 and 15,000 in 1982.  CR 02074
15  (emphasis added).  The FEIS also provides that "[t]he Department
16  of Fish and Game *estimates* that within Plumas County bear
17  populations average .5 to 1.0 bear per square mile."  CR 02074
18  (emphasis added).

19          Defendants data is insufficient to serve as a proxy for
20  population monitoring.  First, the FEIS explicitly states that
21  the population numbers set forth by the California Department of
22  Fish and Game are beliefs and/or estimate about the current
23  status of black bears statewide and specifically within the
24  Project area.  Second, the FEIS sets forth no information
25  regarding the methodology used to obtain this data.  Finally,
26  defendants fail to offer any analysis or factual basis for
27  determining the quantity or quality of suitable habitat.
28  /////

1   Therefore, the Forest Service's analysis does not satisfy the
2   population monitoring requirement of the NFMA.

3       Based upon the foregoing analysis, the Forest Service's
4   approval of the Project without appropriate or sufficient
5   population and habitat data for the American marten, the pileated
6   woodpecker, and the black bear is contrary to the NFMA and
7   governing provisions of the forest plan.

8   **III.   Injunctive Relief**

9       Plaintiffs seek to enjoin the Forest Service from
10  implementing the Project until the Forest Service complies with
11  NEPA, NFMA, and the Lassen LRMP.  To determine whether injunctive
12  relief is appropriate, the court applies the traditional balance
13  of harms analysis.  National Parks & Conservation Ass'n v.
14  Babbitt, 241 F.3d 722, 737 (9th Cir. 2001) (quoting Forest
15  Conservation Council v. United States Forest Serv., 66 F.3d 1489,
16  1496 (9th Cir. 1995).  "Environmental injury, by its nature, can
17  seldom be adequately remedied by money damages and is often
18  permanent or at least of long duration, i.e., irreparable."  Id.
19  (quoting Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531, 542
20  (1987)).  "If such injury is sufficiently likely, therefore, the
21  balance of harms will usually favor the issuance of an injunction
22  to protect the environment."  Amoco, 480 U.S. at 545.  Further,
23  the Ninth Circuit has repeatedly held that "absent 'unusual
24  circumstances,'[23] an injunction is the appropriate remedy for

25

26          [23]   However, defendant-intervenor SPI asserts that "unusual
    circumstances" exist in this case because it has been awarded
27  timber sale contracts in relation to the implementation of the
    Project.  However, SPI cites to no applicable cases where a court
28                                              (continued...)

45

violation of NEPA's procedural requirements." Thomas v. Peterson, 753 F.2d 754, 764 (9th Cir. 2985) (citing Save Our Ecosystems v. Clark, 747 F.2d 1240, 1250 (9th Cir. 1984); Alpine Lakes Protection Soc'y v. Schlapfer, 518 F.2d 1089 (9th Cir. 1975); Lathan v. Volpe, 455 F.2d 1111, 1116-17 (9th Cir. 1971)).

In this case, the record demonstrates that it is sufficiently likely that implementation of the Project will cause irreparable harm to old forests through the unnecessary cutting of trees that might otherwise survive. See Earth Island, 442 F.3d at 1177. The record also demonstrates that the Project will

---

[23](...continued)
has denied injunctive relief in an environmental case based upon the award of timber sale contracts. Defendant-intervenor cites to the Ninth Circuit's decision affirming the denial of injunctive in Forest Guardians v. Dombeck, 131 F.3d 1309 (1997). However, in Forest Guardians, plaintiffs sought to retroactively apply amendments to the applicable Land and Resource Management Plan, and the court held that the Forest Service did not err in applying the old standards to prior existing agreements and applying the new standards to new authorizations, contracts, and permits. In this case, plaintiffs seek to enforce federal statutes, specifically NEPA and NFMA, that were applicable when the contracts were awarded to SPI. As such, Forest Guardians is inapplicable.

Further, based upon Ninth Circuit precedent relating to the weight given economic harm in an environmental case, the court finds SPI's argument unavailing.

Federal defendants also assert that they should be allowed further proceedings to present evidence that "unusual circumstances" weigh against injunctive relief. (Mem. P.&A. in Supp. of Federal Defs.' Mot. for Summ. J., filed June 26, 2006, at 7 n.3). However, when asked at oral argument what "unusual circumstances" they referred to, federal defendants deferred to SPI's counsel to present argument.

Federal defendants also request additional proceedings to present evidence to assist the court in fashioning the appropriate scope of any injunctive relief awarded. However, when asked at oral argument how relief might be shaped, federal defendants offered no suggestions or insight into how they might assist the court.

1 likely cause irreparable harm to the wildlife that inhabit the

2 project area, including the California spotted owl and the

3 American marten.

4      In light of the above finding of potential irreparable harm

5 to the environment, the balance of hardships tips in plaintiffs'

6 favor.  Defendant-intervenor SPI argues that it will suffer

7 economic losses by enjoining the Project, and thus, the timber

8 sales.  SPI also argues that curtailments and layoffs will likely

9 occur at its Quincy sawmill and cogeneration facility.  (Decl. Of

10 Mark Bosetti in Supp. of SPI's Mem. of P.&A., filed June 26,

11 2006, ¶ 5).  The court is not unmindful of the adverse economic

12 consequences that can result when environmental laws are

13 violated.  Such consequences may include loss of revenues to both

14 the government and private business.  Importantly, workers, their

15 families, and the community also may be adversely affected by a

16 finding that the Forest Service has failed to abide be the legal

17 requirements of NEPA and NFMA.  Nevertheless, the "loss of

18 anticipated revenues . . . does not outweigh the potential

19 irreparable damage to the environment."  <u>Babbitt</u>, 241 F.3d at

20 738; <u>Earth Island</u>, 442 F.3d at 1177.  The Ninth Circuit has noted

21 "the importance of preserving the public's interest in

22 'preserving precious, unreplenishable resources.'"  <u>Earth Island</u>,

23 442 F.3d at 1177 (quoting <u>Earth Island</u>, 351 F.3d at 1309).[24]

24 ───────────────

25      [24]   The court is troubled that the Ninth Circuit has
expressed concern over "a disturbing trend in the Forest
26 Service's recent timber-harvesting and timber-sale activities,"
<u>Earth Island</u>, 442 F.3d at 1177-78 (collecting cases), observing
27 that, in many recent cases analogous to this case, the Forest
Service "appears to have been more interested in harvesting
28                                              (continued...)

The environment is a vital constituent public interest that must be recognized and protected by federal law even in the face of adverse economic consequences.

## CONCLUSION

For the reasons stated above, the court finds the following:

(1)  The Forest Service violated NEPA by failing to analyze an adequate range of alternatives, particularly alternatives involving less intensive logging.

(2)  The Forest Service violated NEPA by failing to take a hard look at the Creeks Forest Health Recovery Project's impact on the American marten and the California spotted owl.

(3)  The Forest Service violated NFMA by failing to insure viable, well-distributed populations of the American marten and the California spotted owl.

(4)  The Forest Service violated NFMA by approving the Project without appropriate or sufficient population and habitat data for the American marten, the pileated woodpecker, and the black bear.

/////

/////

/////

/////

/////

/////

---

[24](...continued)
timber than in complying with our environmental laws." Id. at 1178.

48

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Based upon the above findings, the court hereby enjoins the Forest Service from implementing the Creeks Forest Health Recovery Project until and unless the Forest Service complies with NEPA, NFMA, and all applicable laws, and an EIS is prepared in conformity with NEPA and NFMA.

IT IS SO ORDERED.

DATED: August 16, 2006.

/s/ Frank C. Damrell Jr.
FRANK C. DAMRELL, Jr.
UNITED STATES DISTRICT JUDGE

49