UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

SIERRA NEVADA FOREST
PROTECTION CAMPAIGN, SIERRA
CLUB, and LASSEN FOREST
PRESERVATION GROUP,

      Plaintiffs,

      v.

LAURIE TIPPIN, in her official
capacity as Forest Supervisor
of the Lassen National Forest,
BERNARD WEINGARDT, in his
official capacity as Regional
Forester; and UNITED STATES
FOREST SERVICE,

        Defendants.
_____/

NO. CIV. S 06-00351 FCD DAD

**AMENDED** MEMORANDUM AND ORDER[1]

----oo0oo----

_____

[1]   This amended memorandum and order makes minor
modifications to the order filed on August 16, 2006, relating to
non-substantive, typographical errors brought to the court's
attention by plaintiffs' Request for Correction, filed Sept. 5,
2006.  That order is hereby VACATED and the instant order
supercedes it in all respects.

1

This matter is before the court on cross motions for summary judgment filed by plaintiffs, Sierra Nevada Forest Protection Campaign, Sierra Club, and Lassen Forest Preservation Group (collectively "plaintiffs"), and defendants, Laurie Tippin, Bernard Weingardt, and the United States Forest Service (collectively "defendants" or "Forest Service").  The court heard oral argument from parties' counsel on August 4, 2006.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

### A.   The Creeks Forest Health Recovery Project

The present controversy surrounds the Creeks Forest Health Recovery Project ("the Project"), a resource management project located within the Lassen National Forest, Almanor Ranger District.  (Pls.' Resp. To Defs.' Statement of Undisputed Facts ("DSUF"), filed July 21, 2006, ¶ 1).  The Project area encompasses approximately 33,000 acres and is located twelve miles south of Chester, California, within Plumas County.  (DSUF ¶ 2).

As outlined, the Project includes various techniques for resource management, including the construction of a strategic system of fuel breaks called defensible fuel profile zones ("DFPZs"), and two uneven-aged methods of timber harvest: group selection and harvest by selection of individual trees.  (DSUF ¶ 4).  DFPZs are a strategic system of linear fuelbreaks with open forest cover and dominated by larger, fire-tolerant trees.  (DSUF ¶ 4).  The stated purpose of DFPZs is to create a system of fuelbreaks to provide fire suppression personnel relatively safe

---

[2]    The following facts are undisputed, except where noted to the contrary.

locations from which to take action against wildfires.  (DSUF ¶ 8).  Group selection involves harvest of patches (.25 to 2 acres) of forest for the purposes of regenerating uneven-aged stands and promoting the growth of shade-tolerant trees.  (DSUF ¶ 4).  The stated purpose of group selection to achieve an all-age, multi-story, fire-resilient forest while contributing to the local economy through a sustainable output of forest products.  (DSUF ¶ 10).  The stated purpose of individual tree selection is to lower forest stand densities by removing small to intermediate-sized trees in order to improve forest health, assist in the maintenance of late-successional forest conditions, and assist the DFPZs in creating a strategic network of areas with reduced fuel concentrations where fire severity and spread would be reduced.  (DSUF ¶ 9).

Specifically, the Project authorizes approximately 10,376 acres of logging, including 5,905 acres of DFPZs, 3,285 acres of individual tree selection (area thinning), and 1,245 acres of group selection treatments.  (DSUF ¶ 6).  In all treatment areas, trees greater than 30 inches diameter at breast height ("dbh") would be retained, except where removal is required for operability or safety reasons.  (DSUF ¶ 6).  In the group selection areas, approximately 1,150 acres would be interplanted. (DSUF ¶ 6).  Approximately 150 acres of group selection treatment would be left to regenerate naturally.  (DSUF ¶ 6).

**B.    Regulatory Framework**

Forest planning decisions are impacted by several overlapping statutory and regulatory regimes.

///

3

1        **1.   National Environmental Policy Act**

2        The National Environmental Policy Act, 42 U.S.C. § 4321, et

3   seq., ("NEPA"), was enacted by Congress in 1969 to "declare a

4   national policy which will encourage productive and enjoyable

5   harmony between man and his environment; promote efforts which

6   will prevent or eliminate damage to the environment . . . [and]

7   to enrich the understanding of the ecological systems and natural

8   resources important to the nation. . . .."  42 U.S.C. § 4321.

9   Despite this ambitious declaration of purpose, NEPA has been

10  interpreted as essentially procedural.  <u>See</u> <u>Blue Mountains</u>

11  <u>Biodiversity Project v. Blackwood</u>, 161 F.3d 1208, 1212 (9th Cir.

12  1998)(noting that the purpose of NEPA is to 'ensure a process,

13  not to ensure any result.'").  The NEPA process is designed to

14  "ensure that the agency . . . will have detailed information

15  concerning significant environmental impacts; it also guarantees

16  that the relevant information will be made available to the

17  larger [public] audience."  <u>Blue Mountains</u>, 161 F.3d at 1212.

18       **2.   National Forest Management Act**

19       The National Forest Management Act of 1976, 16 U.S.C. §

20  1604, et seq., ("NFMA"), requires the Secretary of Agriculture to

21  "develop, maintain, and, as appropriate, revise land and resource

22  management plans for units of the National Forest System."  16

23  U.S.C. § 1604(a).  The Forest Service, which manages the System,

24  develops land and resource management plans pursuant to the NFMA,

25  and uses these forest plans to "guide all natural resource

26  management activities," including use of the land for "outdoor

27  recreation, range, timber, watershed, wildlife and fish, and

28  wilderness."   16 U.S.C. § 1604(e)(1); 36 C.F.R. § 219.1(b).  In

4

1    developing forest plans, the Service must take both environmental

2    and commercial goals into account.  See e.g., 16 U.S.C. §

3    1604(g); 36 C.F.R. § 219.1(a).

4        Forest planning occurs at two levels: forest and project.

5    At the forest level, the Forest Service develops a Forest Plan,

6    which is a broad, long-term programmatic planning document for an

7    entire National Forest.  Each Forest Plan includes goals and

8    objectives for individual units of the forest and provides

9    standards and guidelines for management of forest resources.

10   Consistent with its obligations under the NFMA, in 1993, the

11   Forest Service adopted the Lassen National Forest Land and

12   Resource Management Plan (the "Lassen LRMP"), which provides

13   standards and guidelines for project-level planning within the

14   Lassen National Forest.  In 1999, the Forest Service adopted the

15   Herger-Feinstein Quincy Library Group (QLG) record of decision

16   (ROD) which amended the LRMP for the Lassen National Forest and

17   other national forests in the Northern Sierra Nevada.  In 2001,

18   the Forest Service approved the Sierra Nevada Forest Plan

19   Amendment (SNFPA), also known as the Sierra Nevada Framework,

20   which amended the LRMPs for all national forests in the Sierra

21   Nevada (the "2001 Framework").  Finally, in 2004, the Forest

22   Service replaced the 2001 Framework with a new plan, referred to

23   as the 2004 Framework or 2004 Supplement, which also amended the

24   LRMPs for all Sierra national forests.  Because the Project lies

25   within the Lassen National Forest, it must be consistent with the

26   1993 Lassen LRMP, as amended by the QLG ROD and the 2004

27   Framework.

28   ///

**C.   History of the Creeks Forest Health Recovery Project**

The Forest Service initiated the scoping process for the Project in June 2004.  (Defs.' Resp. To Pls.' Statement of Undisputed Facts ("PSUF"), filed June 26, 2006, ¶ 13).  On June 4, 2004, a scoping letter, including a detailed description of the proposed action and a map showing the location of the proposed action, was sent to interested parties.  (DSUF ¶ 11). Plaintiffs submitted detailed comments in response, describing the kind of information, analysis, and alternatives that should be included in the environmental analysis for the project.  (PSUF ¶ 13).  On February 14, 2005, the Forest Service initiated a second scoping process and announced that an Environmental Impact Statement ("EIS") would be prepared in connection with the Project.  (DSUF ¶ 12).  Plaintiffs also submitted comments in response to the second scoping period, in particular, urging that the EIS consider all reasonable alternatives, including alternatives that would protect trees 20" diameter and greater, that maintain canopy cover at 50% or greater, and that are consistent with the 2001 Framework.  (PSUF ¶ 13).

In May 2005, the Forest Service issued a draft EIS ("DEIS") for the Project, including a proposed action.  (PSUF ¶ 14; DSUF ¶ 13).  Other than the proposed action and "no action," the DEIS failed to consider in detail any alternatives.  (PSUF ¶ 14).  On June 6, 2005, the Forest Service initiated a formal 30-day notice and comment period on the Project DEIS by publishing a notice in the Lassen County Times.  (DSUF ¶ 13).  Plaintiffs filed comments on the DEIS, together with critiques from experts in the field of wildlife biology and fire ecology.  (PSUF ¶ 14).  In their

6

1  comments, plaintiffs argue that the Forest Service had (1) failed

2  to disclose important information about environmental impacts;

3  (2) failed to analyze all significant issues; and (3) failed to

4  consider reasonable alternatives.  (RSUF ¶ 14).  Wildlife

5  biologists who reviewed the plan concluded that the Project would

6  adversely affect the spotted owl, marten, and fisher, potentially

7  threatening the viability and distribution of these species.

8  (RSUF ¶ 14).  The Forest Service prepared a substantive response

9  to the comments received on the DEIS, which plaintiffs assert was

10 not legally adequate.  (RSUF ¶ 15).

11     In September 2005, the Forest Service issued a record of

12 decision (ROD) and final EIS ("FEIS") approving the Project.

13 (PSUF ¶ 15; DSUF ¶ 16).  The FEIS considered fourteen

14 alternatives to address the enumerated purpose and need[3] of the

15

16     [3]     The stated purpose and need of the Project in the FEIS
   is as follows:

17     1.     Implementation of the Herger-Feinstein Quincy Library
18            Group ("HFQLG") Act , which requires the construction
               of a network of DFPZs, group-selection timber harvest,
               and individual tree selection (area thinning);
19     2.     Implementation of a DFPZ as part of an extensive fuel
20            treatment network that is effective in reducing the
               potential size of wildfires, and providing safe
21            locations for fire suppression personnel in the event
               of a wildfire;
22     3.     Implementation of individual tree selection (area
               thinning) to promote forest health and provide an
               uneven-aged structure to forested stands;
23     4.     Implement of group selection as directed in the 1998
               HFQLG Act to achieve desired future condition of all-
24            age, multistory, fire-resilient forests while
               contributing to the local economy though a sustainable
25            output of forest products;
26     5.     Implementation of economically efficient treatments to
               reduce hazardous fuels and to contribute to community
               stability; and
27     6.     Providing the necessary access for the construction of
               the DFPZs, group-selection timber harvest, and area
28                                                    (continued...)

7

Project; three studies were considered in detail, while eleven were considered but eliminated from detailed study.[4] (DSUF ¶ 17). The FEIS analyzed in detail a new alternative, Alternative 14, which differs in only minor respects from Alternative 1, the proposed action in the DEIS. (PSUF ¶ 15). The FEIS failed to consider in detail any alternative other then Alternative 14, Alternative 1, and no action. (PSUF ¶ 15).

On September 9, 2005, Forest Supervisor Laurie Tippin signed the record of decision (ROD) for the Project. The ROD implements Alternative 14, as described in the FEIS, and sets forth the rationale for the decision. (DSUF ¶ 19).

In November 2005, plaintiffs appealed the Project decision. (DSUF ¶ 20; PSUF ¶ 17). By letter dated December 19, 2005, the Appeal Deciding Officer denied the appeals and affirmed the Forest Supervisor's decision to approve the Project. (DSUF ¶ 21; PSUF ¶ 17). This decision constituted the final administrative determination of the Department of Agriculture. (PSUF ¶ 17). In January 2006, the Forest Service awarded three of four timber sale contracts implementing the Creeks Project to Sierra Pacific Industries.[5] (DSUF ¶ 22).

---

[3](...continued)
    thinning, and to reduce impacts on the transportation
    system.

(Creeks Forest Health Recovery Project FEIS ("FEIS") provided in the Creeks Forest Health Recovery Project Administrative Record (CR), filed April 20, 2006, at 01867-68).

[4]    Plaintiffs dispute that the Forest Service adequately considered reasonable alternatives. (DSUF ¶ 17).

[5]    On April 6, 2006, Sierra Pacific Industries ("SPI")
                                              (continued...)

1    On February 17, 2006, plaintiffs filed this lawsuit

2 challenging the Project and seeking to have the Project set

3 aside.  The parties agrees that "no logging or other ground

4 disturbing activities will occur to implement the Creeks Project

5 until 14 days after this Court issues a final judgment."  (DSUF ¶

6 22; PSUF ¶ 17).  Plaintiffs assert that defendants' decision to

7 approve the project is contrary to NEPA because the FEIS failed

8 to consider reasonable alternatives and failed to take a hard

9 look at significant environmental issues.  Plaintiffs also assert

10 that the implementation of the Project violates NFMA because (1)

11 the conclusion that the Project will insure the viability and

12 distribution of old forest wildlife is based upon flawed analysis

13 and insufficient evidence and (2) the Forest Service failed to

14 obtain and analyze required wildlife monitoring data prior to

15 approving the Project.  Defendants contend that the Project,

16 including the FEIS, fully complies with NEPA and NFMA.

17                       **STANDARD OF REVIEW**

18 **A.    Summary Judgment**

19    The Federal Rules of Civil Procedure provide for summary

20 adjudication when "the pleadings, depositions, answers to

21 interrogatories, and admissions on file, together with

22

23         [5](...continued)
moved to intervene as a defendant in this matter.  On May 15,
24 2006, the court granted SPI's motion to intervene only as to the
remedial issues in this case.  (Mem. & Order, filed May 15, 2006,
25 Docket No. 23).  However, on June 26, 2006, defendant-intervenor
SPI filed a 16-page brief, primarily addressing the merits of
26 plaintiffs' claims.  Because SPI's role in this case is limited,
the court will not consider SPI's briefing on issues relating to
27 the merits of the claim.  However, the court will consider SPI's
arguments that relate to the injunctive relief sought by
28 plaintiff, which are set forth in large part on pages 15-16.

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

In considering a motion for summary judgment, the court must examine all the evidence in the light most favorable to the non-moving party. <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962). If the moving party does not bear the burden of proof at trial, he or she may discharge his burden of showing that no genuine issue of material fact remains by demonstrating that "there is an absence of evidence to support the non-moving party's case." <u>Celotex Corp. v. Catret</u>, 477 U.S. 317, 325 (1986). Once the moving party meets the requirements of Rule 56 by showing there is an absence of evidence to support the non-moving party's case, the burden shifts to the party resisting the motion, who "must set forth specific facts showing that there is a genuine issue for trial." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986). Genuine factual issues must exist that "can be resolved only by a finder of fact, because they may reasonably be resolved in favor of either party." <u>Id.</u> at 250.

Where as here, the court's review is limited to the administrative record, stipulated to by the parties, there are no triable issues of fact, and summary judgment is appropriate. <u>See Northwest Motorcycle Ass'n v. U.S. Dept. of Agriculture</u>, 18 F.3d 1468 (9th Cir. 1994).

**B.    Administrative Procedures Act**

Under the Administrative Procedures Act ("APA"), the court may set aside a final agency action only where the action is "arbitrary, capricious, an abuse of discretion, or not otherwise

10

1   in accordance with the law." 5 U.S.C. § 706.  Review under the
2   APA is "searching and careful." <u>Ocean Advocates v. United States</u>
3   <u>Army Corps of Eng'rs</u>, 361 F.3d 1108, 1118 (9th Cir. 2004).
4   However, the court may not substitute its own judgment for that
5   of the agency.  <u>Id.</u> (citing <u>Citizens to Preserve Overton Park,</u>
6   <u>Inc. v. Volpe,</u> 401 U.S. 402 (1971), <u>overruled on other grounds by</u>
7   <u>Califano v. Sanders</u>, 430 U.S. 99 (1977).  In short, the court
8   must ensure that the agency has taken a hard look at the
9   environmental consequences of its proposed action.  <u>Oregon</u>
10  <u>Natural Resources Council v. Lowe</u>, 109 F.3d 521, 526 (9th Cir.
11  1997).  As part of this inquiry, the court should ask "whether
12  the [] decision was based on a consideration of the relevant
13  factors and whether there has been a clear error in judgment."
14  <u>Ocean Advocates</u>, 361 F.3d at 1118.  In addition, the court
15  determines "whether the agency articulated a rational connection
16  between the facts found and the choice made."  <u>Id.</u> at 1118-1119
17  (quoting <u>Arizona Cattle Growers' Ass'n v. United States Fish and</u>
18  <u>Wildlife Serv.</u>, 273 F.3d 1229, 1236 (9th Cir. 2001).

19                              **ANALYSIS**

20       Plaintiffs challenge defendants' decision to implement
21  Alternative 14 of the Creeks Forest Health Recovery Project on
22  the basis that this decision violates the National Environmental
23  Policy Act ("NEPA"), 42 U.S.C. § 4321, and the National Forest
24  Management Act ("NFMA"), 16 U.S.C. § 1604.

25  **I.   National Environmental Policy Act (NEPA)**

26       NEPA mandates that federal agencies prepare a detailed
27  Environmental Impact Statement ("EIS") for all "major Federal
28  actions significantly affecting the quality of the human

                                11

1 environment." 42 U.S.C. § 4332(2)(c).  These statements must

2 include a description and analysis of the environmental impact of

3 the proposed action, any adverse environmental effects that

4 cannot be avoided if the action is implemented, alternatives to

5 the proposed action, the relationship between short-term uses and

6 long-term productivity, and any irreversible or irretrievable

7 commitment of resources that would be involved if the action were

8 to be implemented.  Earth Island Inst. v. U.S. Forest Serv., 442

9 F.3d 1147, 1153 (9th Cir. 2006) (citing 42 U.S.C. § 4332(2)(c)).

10 "In short, NEPA requires that a federal agency 'consider every

11 significant aspect of the environmental impact of a proposed

12 action' and 'inform the public that it has indeed considered

13 environmental concerns in its decisionmaking process.'"  Id.

14 (quoting Kern v. U.S. Bureau of Land Mgmt., 284 F.3d 1062, 1066

15 (9th Cir. 2002)).

16     **A.   Failure to Analyze an Adequate Range of Alternatives[6]**

17     Plaintiffs also challenge the adequacy of the FEIS,

18 asserting that it failed to address an adequate range of

19 alternatives.  NEPA mandates that an agency consider and discuss

20 the range of all reasonable alternatives to the proposed action,

21 to "provid[e] a clear basis for choice among options by the

22 decisionmaker and the public."  40 C.F.R. § 1502.14.  An agency

23

24     [6]   Plaintiffs also assert that the FEIS failed to take a
25 hard look at fire and fuels issues and to disclose and respond to
contrary scientific information and opinion.  Many of the
26 arguments that plaintiffs set forth in support of that assertion
overlap with the arguments made in support of the assertion that
27 defendants did not adequately analyze the range of reasonable
alternatives.  As such, and for the reasons set forth herein, the
28 court does not separately analyze plaintiffs' assertion that
defendants failed to take a hard look at fire and fuels issues.

is not required to extensively analyze alternatives that do not meet the purpose and need of the Project. <u>Laguna Greenbelt, Inc. v. United States Dept. of Trans.</u>, 42 F.3d 517, 523-525 (9th Cir. 1994). Nor, however, can the agency narrowly define its purpose and need so as to winnow down the alternatives until only the desired one survives. <u>See Muckleshoot Indian Tribe v. United States Forest Serv.</u>, 177 F.3d 800, 814 n. 7 (9th Cir. 1999) (noting that, in the EIS context, "[o]ne obvious way for an agency to slip past the strictures of NEPA is to contrive a purpose and need so slender as to define competing reasonable alternatives out of consideration. . . .").

Here, the Forest Service evaluated three action alternatives in detail: (1) no action, (2) Alternative 1, and (3) Alternative 14, which differs only in minor respects from Alternative 1 in order to address connectivity concerns that may affect the viability of the American marten. (CR 01869) The two alternatives analyzed by the Forest Service are nearly identical, as is evidenced by the fact that the Forest Service analyzes them in tandem throughout most of the FEIS. (<u>See, e.g.</u>, CR 01892-01912; 01916-01920) Both proposals contain identical quantities of DFPZs and area thinning. Alternative 14, however, provides that 612 acres of DFPZ would be treated with Prescription E, which would leave small "leave islands" up to 1/4 acre in size untreated over approximately 20% of the treatment units to provide a greater component of small sized trees and stand heterogeneity. The similarity between the two action alternatives raises concern that the Forest Service may not have ///

13

taken the requisite hard look.  (Compare CR 01929 with CR 01955;

compare CR 01933 with CR 01956;  compare CR 01936 with CR 01957).[7]

Plaintiffs assert that defendants should have considered, in detail, alternatives involving less intensive logging. Specifically, plaintiffs assert that defendants should have considered (1) at least one option that retained higher canopy cover (e.g., 50%, rather than 30-40%); (2) at least one option that did not direct logging of medium and large trees (e.g., trees larger than 12-20" diameter, rather than 30" diameter); and (3) at least one option based upon the 2001 Framework. Defendants respond that while certain fuel reduction goals of the project may be met be plaintiffs' proposed alternatives, other important goals of the project would not be met, such as providing a safe place for fire-fighting personnel from which to fight wildfire, and improving forest health and economic efficiency.[8]

///

_____

[7]    These citations are set forth as examples of the similarities between the alternatives as illustrated by charts which describe the effect of each alternative's techniques on treated stands within the Project area.  These examples by no means exhaust the examples of similarities between the alternatives set forth in the FEIS.

[8]    At oral argument, defendants also relied heavily on the fact that the Project FEIS "tiers" to the 2004 Framework FEIS. However, while the court acknowledges that this tiering approach is generally acceptable, 40 C.F.R. § 1508.28, the ROD implementing the 2004 Supplement provides that "[s]ite-specific decisions will be made on projects in compliance with NEPA, ESA, and other environmental laws following applicable public involvement and administrative appeal procedures."  CR 00124, at 20; see Earth Island, 442 F.3d at 1154.  Further, site-specific analysis and decisions are referred to consistently throughout the ROD in the area of species conservation as well as in relation to less-intensive logging measures.  See e.g., CR 00124, at 9-11, 17, 27.

14

**1.   Canopy Cover**

Plaintiffs assert that numerous commenters on the DEIS, including experts in fire ecology and wildlife biology,[9] argued that the Forest Service's fuels objectives can be met with less adverse impacts to old forest wildlife by retaining higher canopy cover and urged that the Forest Service consider such an alternative in the EIS.  However, in the FEIS, any alternatives that provided for retaining more canopy closure were rejected.  The Forest Service's stated reasons were that "the alternative does not meet Purpose and Need Statements 1 through 3," (CR 01913), and that to reduce canopy closure "any further would compromise the effectiveness of the DFPZs," (CR 01914).  The Forest Service provided no further explanation as to why canopy closure would not meet the Purpose and Need statements or why reduction would compromise the effectiveness of DFPZs.

In their briefing, defendants assert that plaintiffs' suggested canopy cover limits would prevent the Forest Service from accomplishing its goal of promoting forest health because high stand densities force individual trees to compete for resources and are at risk for insect and disease outbreaks.  As

---

[9]   For example, Dr. Dennis Odion, a fire ecologist at the University of California, Santa Barbara, concluded that fuels reduction goals can be met by logging only small trees and by retaining greater canopy cover.  CR 01836; see also 01830-32. While an appendix to the FEIS quotes his comments, neither the appendix nor the text of the FEIS discusses the basis for his scientific opinion or responds to the scientific information provided.  See Sierra Club v. Eubanks, 335 F. Supp. 2d 1070, 1078 (E.D. Cal. 2004) (finding that despite disclosure of expert comments and conclusions, including one from Dr. Odion, the Forest Service failed to take a hard look because there was "no indication that any views [] expressed contrary to the logging proposed by the [project] were duly weighed").

1  an initial matter, this justification was not listed by the
2  Forest Service as a reason for rejecting the alternatives calling
3  for greater retention.  See Motor Vehichle Mfrs. Ass'n of U.S.,
4  Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 50 (1983)
5  ("It is well established that an agency's action must be upheld,
6  if at all, on the basis articulated by the agency itself.").  To
7  support their argument, defendants point to a number of pages in
8  the FEIS, none of which were cited to or referenced in the FEIS
9  as an explanation why the alternatives were summarily dismissed
10  without detailed analysis.  This runs contrary to the public
11  disclosure purpose of NEPA, which requires that "the public
12  receive the underlying environmental data from which a Forest
13  Service expert derived her opinion."  Ecology Center v. Austin,
14  430 F.3d 1057, 1067-68 (9th Cir. 2005) (quoting Idaho Sporting
15  Cong., 137 F.3d at 1150) (holding that the Forest Service
16  violated NEPA by failing "to either adequately explain its impact
17  assessment or provide the information that is necessary to
18  understand and evaluate the Forest Service's decision"); see also
19  Earth Island, 442 F.3d at 1159 (quoting Native Ecosystems Council
20  v. U.S. Forest Serv., 418 F.3d 953, 960 (9th Cir. 2005) (holding
21  that a review of the adequacy of an FEIS's hard look includes "a
22  pragmatic judgment whether the [FEIS's] form, content, and
23  preparation foster both informed decision-making and informed
24  public participation") (emphasis added).

25      Further, defendants citations to the administrative record
26  do not fully support their proposition.  Defendants argue that
27  maintaining 50% canopy cover would result in excess crown bulk
28  density.  However, plaintiffs point to evidence in the record

that stands logged to 50% canopy cover would on average result in
49% of maximum stand density after logging, CR 00858, which is
within the range of "desirable stand densities," CR 01883.   In
response, defendants point to evidence that thinning to 50%
canopy cover would retain undesirably high stand densities on
modeled stands.  CR 00861.  Given these conflicting conclusions
that could be reached based upon the agency's own findings, how
can the Forest Service justify that "it was immediately clear"
that the proposed alternatives retaining higher canopy cover
would inhibit the goal of promoting a healthy forest?  The Forest
Service offers no explanation for this conclusion.

Finally, defendants' arguments only address the alleged
insufficiencies of retaining 50% canopy cover, but do not address
why alternatives were not considered that retained higher canopy
cover than Alternatives 1 or 14, but less than 50%.  The Forest
Service again offers no explanation for the failure to do so.

In light of the above deficiencies, the court finds that
defendants have simply failed to adequately explain why the goal
of "forest health" justifies the wholesale rejection of all
alternatives involving retaining higher canopy cover.

### 2.   12-20" dbh Limit

Plaintiffs also assert that various commenters and experts
argued that the Forest Service's fuel objective could be met by
less intensive logging which would not log medium and large trees
(trees 12-20" dbh).[10]  However, in the FEIS, any alternatives

---

[10]   For example, Chad Hanson, a Ph.D student at the
University of California, Davis with a research focus on fire
                                            (continued...)

that provided for retaining medium and large trees were rejected. The Forest Service's stated reasons were that "the alternative does not meet Purpose and Need Statements."  (CR 01912-13).  The Forest Service provided no further explanation.

In their briefing,[11] defendants assert that setting a 12" dbh limit or 20" dbh limit would make it difficult to implement the project in a cost-effective manner.  In support of this assertion, defendants point to the 2004 SNFPA, which modified the 2001 SNFPA to "improve the cost-effectiveness of treatments."  CR 124, at 9; CR 124, at 91 ("[E]xisting diameter limit restrictions have significantly reduced managers' ability to design and implement cost-efficient fuels treatments.").  Yet nowhere in the FEIS does the Forest Service provide any analysis regarding the cost-effectiveness of each of the various alternative approaches.  Rather, the Forest Service simply dismissed out of hand without a reasoned explanation any proposal which would have called for a lower diameter limit.  This does not constitute a hard look at reasonable alternatives.  See Klamath-Siskiyou Wildlands Ctr. v. U.S. Forest Serv., 373 F. Supp. 2d 1069, 1089-90 (E.D. Cal. 2004).

---

[10](...continued)
ecology in forest ecosystems, cited specific research which demonstrates that severe fire could be prevented by logging only trees 8-10" in diameter.  CR 01697-99.  While an appendix to the FEIS quotes his comments, neither the appendix nor the text of the FEIS discusses the basis for his scientific opinion or responds to the scientific information provided.  See Sierra Club, 335 F. Supp. 2d at 1078.

[11]    Because defendants failed to include these reasons in the FEIS, these explanations suffer from the same problems as those relating to canopy cover.  See Motor Vehicle Mfrs. Ass'n of U.S., Inc., 463 U.S. at 50.

### 3.   2001 Framework

Finally, plaintiffs assert that defendants should have analyzed in detail an alternative that implements the 2001 Framework.  Experts, including Dr. Tom Kucera, an expert cited by the Forest Service in the FEIS, stated that this would be an "obvious alternative that should be analyzed" because "[s]uch an alternative would have a much less adverse impact on marten populations and habitat connectivity while meeting the project's purpose and need."  CR 01775.  In response, the FEIS states that "[t]he 2004 SNFPA ROD has superceded the 2001 SNFPA ROD. . . . This alternative would not be consistent with the 1993 Lassen LRMP, as amended by the 2004 SNFPA ROD."  CR 01912.

To the extent that defendants assert that the 2004 Framework supercedes the 2001 Framework such that implementation of a plan in accordance with the 2001 Framework would be inconsistent with the 2004 Framework, they are mistaken.  The 2004 Framework amended the 2001 Framework to provide the Forest Service with increased flexibility, but *did not mandate* more intensive logging measures.  CR 00119-20 (setting more flexible maximum guidelines for logging, but not mandating minimum requirements).  Further, the U.S. Environmental Protection Agency ("EPA"), in its scoping comments on a similar project in the Sierra Nevada, recommended that the Forest Service include a comparison of the 2001 Framework and the 2004 Framework as well as an evaluation of an alternative which would implement the 2001 Framework in the environmental documentation.  CR Supp. 05215.  The stated reason for these recommendations was the "on-going public debate . . . regarding the scientific basis for; the fuel management,

19

environmental, and social benefits of; and the adverse effect
associated with the 2004 [Framework] versus the [2001
Framework]."  CR Supp. 05215.  As such, an alternative applying
the 2001 Framework would not necessarily be inconsistent with the
2004 Framework.

In their briefing, defendants argue that because the
plaintiffs focus on the retention of canopy cover and the 12-20"
dbh limit aspects of the 2001 Framework, this alternative is
merely a repackaging of plaintiffs previous two arguments.[12]  To
the extent that this argument has any merit, the court has found
that defendants failure to consider those alternatives violated
NEPA.

Accordingly, the court finds that the Forest Service
arbitrarily and capriciously failed to analyze an adequate range
of alternatives or to explain sufficiently why other alternatives
would not accomplish the Project's purpose and need.

### B.   Failure to Take a Hard Look at Environmental Impacts

NEPA does not contain substantive environmental standards
but instead establishes procedural requirements to ensure that
agencies take a hard look at the environmental impacts of their
actions.   Earth Island, 442 F.3d at 1154 (citing Kern, 284 F.3d
at 1066).  "A hard look includes 'considering all foreseeable
direct and indirect impacts.'"  Id. at 1159 (quoting Idaho
Sporting Cong. v. Rittenhouse, 305 F.3d 957, 973 (9th Cir.
2002)).  A hard look also includes "a discussion of adverse

---

[12]   Because defendants failed to include these reasons in
the FEIS, these explanations suffer from the same problems as
those relating to canopy cover and dbh limits.  See Motor
Vehichle Mfrs. Ass'n of U.S., Inc., 463 U.S. at 50.

impacts that does not improperly minimize negative side effects." Id. at 1159 (citing Native Ecosystems Council v. U.S. Forest Serv., 428 F.3d 1233, 1241 (9th Cir. 2005)).  The Forest Service, therefore, must "undertake a thorough environmental analysis before concluding that no significant environmental impact exists."  Id. (citing Native Ecosystems, 428 F.3d at 1239).  In reviewing the adequacy of an EIS, the Ninth Circuit applies the "rule of reason" standard, "which requires 'a pragmatic judgment whether the EIS's form, content and preparation foster both informed decision-making and informed public participation.'" Native Ecosystems, 418 F.3d at 960 (9th Cir. 2005) (quoting California v. Block, 690 F.2d 753, 761 (9th Cir. 1982)).

Pursuant to NEPA, "[a]gencies shall insure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements."  40 C.F.R. § 1502.24.  "Agencies have wide discretion in assessing scientific evidence, but they must 'take a hard look at the issues and respond to reasonable opposing viewpoints.'"  Earth Island, 442 F.3d at 1160.  An agency must be permitted discretion in relying on the reasonable opinion of its own qualified experts, even if the court might find contrary views more persuasive.  See Kleppe v. Sierra Club, 427 U.S. 390, 410 n.21 (1976).  However, NEPA does not permit an agency to rely on the conclusions and opinions without providing both supporting analysis and data.  Idaho Sporting Cong., 137 F.3d at 1150.  An agency must also evaluate and disclose credible scientific evidence that contraindicates a proposed action.  40 C.F.R. § 1502.9(b).

///

1          **1.   American Marten**

2          Plaintiffs contend that the FEIS fails adequately to analyze

3   and disclose the project's likely adverse impacts to the American

4   marten and its habitat.  Specifically, plaintiffs assert that the

5   FEIS fails to disclose new research that indicates that the

6   marten's population in the northern Sierra is far more precarious

7   than assumed in the FEIS and that the FEIS fails adequately to

8   analyze and disclose the project's adverse impacts to marten

9   habitat, particularly habitat connectivity.

10         The FEIS provides that "marten appear to occupy much of its

11  historic range in California particularly in the Sierra Nevada."

12  CR 02047 (citing Kucera et al 1995).  However, Dr. Thomas Kucera,

13  the same expert cited by the Forest Service, submitted comments

14  on the DEIS and FEIS, asserting that "the statement in the FEIS

15  is misleading and fails to recognize the marten's imperiled

16  status in the area."  CR 03876.  Kucera relies on a 2005 peer

17  reviewed paper by Forest Service carnivore expert Dr. William

18  Zielinski[13] and an earlier 2004 paper by Zielinski that included

19  similar information.  "The research concluded that the marten is

20  a species 'with substantial changes in distribution,' including

21  'large gaps between contemporary detections that were not present

22  historically' in the northern Sierra Nevada and southern

23  Cascades."  CR 03876 (citing Zielinski 2004, Zielinski et al.

24  2005a).  The research also concludes that marten "populations in

25  the southern Cascades and northern Sierra Nevada now appear

26  discontinuous," CR 03876 (citing Zielinski et al. 2005a: 1394),

27  

28         [13]   The FEIS also cites to previous research conducted by
    Dr. Zielinski in its analysis of the marten and fisher.

                                    22

and that "the apparent reduction in the range of the marten and
other forest carnivores is most likely due to a combination of
factors, including 'loss of mature forest habitat,'" CR 03876
(citing Zielinkski et al. 2005a: 1385-86).  Kucera summarizes
that this research indicates that the marten's status in the
northern Sierra Nevada is precarious.  CR 03876.  The FEIS fails
to consider this research.

Pursuant to the Ninth Circuit's rule of reason standard, the
FEIS's form, content and preparation should foster both informed
decision-making and informed public participation.  <u>Native
Ecosystems</u>, 418 F.3d at 960 (9th Cir. 2005).  Defendants, citing
CR 02047, argue that no new published data cited by plaintiffs
contradicts the statement that the marten occupies most of its
historic range.[14]  However, the statement in the FEIS would
likely lead a reasonable person to believe that the marten is not
imperiled in the Sierra Nevada, specifically in light of the
absence of any reference to the 2004 or 2005 research conducted
by Zielinski.  As such, the FEIS does not foster informed public
participation.  This issue is also particularly troubling because
the expert cited by the Forest Service, Dr. Kucera, maintains

---

[14]    Defendants also note that the paper cited to defendant
was published in August 2005, while the FEIS is dated September
14, 2005.  The implication that the agency does not have to
consider "eleventh-hour" research to comply with NEPA is without
merit.  Further, defendants do not address the 2004 research by
Zielinski that included similar information.

Zielinsky's 2004 research cited by plaintiffs is not
included in the administrative record.  As such, the court will
not examine the research itself.  However, the court will analyze
the research to the extent that it is referenced in Kucera's
comments to the FEIS, which is included in the administrative
record.

1  that the science relied upon is outdated and the characterization
2  is misleading.  CR 03876.

3       Defendants also contend that the FEIS analyzes ranger
4  district and Forest Survey records from within the Creeks project
5  area, sufficient to satisfy NEPA.  However, defendants have
6  excluded from their analysis any reference to the most recent
7  research conducted by the very experts whose past opinions they
8  relied upon in formulating the FEIS.  Further, the most current
9  research raises serious questions about the viability of the
10 marten in the Project area.  See Seattle Audobon Soc. v. Espy,
11 998 F.2d 699, 704 (9th Cir. 1993) (finding that the Forest
12 Service failed to take a hard look for purposes of NEPA where it
13 did not address in any meaningful way a report that concluded the
14 spotted owl was declining more substantially and more quickly
15 than previously thought).  Therefore, because defendants failed
16 to address the most recent research regarding the viability of
17 the marten and because the exclusion of such reference is
18 misleading, defendants failed to take a hard look at the impact
19 of the project on the American marten and its habitat.

20      Plaintiffs also assert that defendants failed adequately to
21 analyze the impact of the project on habitat connectivity between
22 northern and southern marten populations.  The FEIS acknowledges
23 that Alternative 1 would negatively affect marten habitat
24 connectivity, CR 2054, but provides that Alternative 14 includes
25 a new DFPZ Prescription (Prescription E) which will maintain
26 north-south habitat connectivity, CR 2062-65.  Plaintiffs argue
27 that the FEIS is deficient because it fails to indicate where the
28 ///

prescription will be applied and fails to provide any specific

information about the habitat quality.  The FEIS provides that:

> Prescription E combines a higher retention of canopy
> (40-45% minimum) with untreated areas within 10% of the
> stand and a higer retention of down logs (>12 inch
> small end diameter) to improve conditions for subnivean
> foraging and provided sufficient cover.  These
> prescriptions were placed strategically to link the
> areas of highest habitat quality.  This included areas
> within the former habitat management area, linking
> areas to the south (Storrie Fire area) to the higher
> quality red fir and linkages from the Butt Creek
> drainage north to the higher quality habitat identified
> in Alternative 1.  This alternative also maintains
> existing linkages to the north and west within the
> former HMA.

CR 02062.

However, while the FEIS acknowledges that the Project would

create consequences to marten habitat connectivity, the Forest

Service failed to analyze Zielinski's research from both 2004 and

2005.  Zielinksi's 2005 report includes a map of marten habitat

in the Sierra Nevada's, demonstrating that most of the treatments

in the Project area overlap with areas determined to have

moderate habitat suitability for marten.  CR 03898, 03903.  The

map also illustrates that the Project occurs within the area

directly between two areas of high quality marten habitat and

includes the best habitat between those areas.  CR 3903.  As

such, the research and expert analysis demonstrates that the

Project area likely plays an important role in ensuring north-

south habitat connectivity for marten and reducing the

possibility that marten populations to the north and south will

become isolated from one another.  CR 3903.  While Zielinski's

2005 study is included in the administrative record in this case,

25

1  along with analysis and comments by an expert,[15] there is no
2  indication that this information was duly weighed in the FEIS.
3  See Sierra Club v. Eubanks, 335 F. Supp. 2d 1070, 1078-79 (E.D.
4  Cal. 2004).

5       The FEIS acknowledges the limits to the scientific
6  information available relating to the marten.  CR 02047.  Because
7  the Forest Service failed to analyze and evaluate the most recent
8  scientific information on the marten, which was prepared by a
9  leading Forest Service expert and that offered more detailed
10  information relating to habitat connectivity issues implicated by
11  the Project, the court cannot find that the Forest Service
12  sufficiently evaluated the effects of the Project on habitat
13  connectivity.  See Seattle Audobon Soc'y, 998 F.2d at 704 ("If
14  [the project] is based on an incomplete NEPA analysis of the
15  consequences continued logging will have on . . . old growth
16  dependant species' viability over both the short and long term,
17  there will be a gap in planning that cannot be closed.").
18  Therefore, the court finds that the Forest Service abused its
19  discretion in failing to disclose and analyze this information
20  and thus, failed to take a hard look at the impact of the Project
21  on marten habitat connectivity as required by NEPA.

22                    **2.  Pacific Fisher**

23       Plaintiffs contend that the FEIS entirely failed to consider
24  the project's impacts on the Pacific fisher and its habitat.

25

26       [15]   Dr. Susan Britting, a biological consultant with a
    Ph.D. in Biology from University of California, Los Angeles,
27  submitted a report establishing the overlap between the Project
    and areas identifies by Zielinkski in his 2005 research as
28  important to fisher and marten conservation.  CR 03900-04.

                              26

Specifically, plaintiffs object to the finding in the FEIS that
"the project area provides little or no habitat potential for
this species therefore the project would have little or no affect
on the totality of habitat within its former range."  CR 02049.
Plaintiffs assert that this conclusion is flatly inconsistent
with a recent analysis by leading Forest Service researchers,
specifically Zielinski, that indicates that the project area
provides moderate to moderately-high potential habitat for the
fisher.  CR 03902.  Defendants contend that the Forest Service's
conclusions regarding fisher are well-founded.[16]  Specifically,
defendants assert that the conclusion is supported by: (1) the
absence of some vegetative components favored by fisher; (2)
higher elevations of the project areas and deep winter snow packs
that persist for long periods; and (3) overlap with marten.  CR
02048-49.

     While defendants could have disclosed and examined the
recent research by Zielinski in the FEIS but chose not to, the
failure to do so was not an abuse of discretion.  The research by
Zielinski referenced by plaintiffs was an exercise "designed to
identify general areas for consideration" for fisher conservation
and reintroduction.  CR 03894.  However, Zielinski's research
also provides that

///

---

[16]     Defendants also contend that the predictive habitat
model relied upon by plaintiffs was not available during the
Project's analysis and the utility and accuracy of the research
remains unknown.  However, the research by Dr. Zielinksi, a
Forest Service expert relied upon throughout the FEIS for his
research on marten and fisher, is dated June 27, 2005, CR 03890,
whereas the Project was not approved until September 9, 2005.  As
such, the court finds this argument unavailing.

27

1
2
3
4

> Regional marten habitat connectivity should also be
> considered in selecting fisher conservation areas.  For
> example, if the Plumas County candidate site is used as
> a fisher reintroduction location it would appear to be
> more disruptive to the goal of martens maintaining
> north-south continuity between the Sierra Nevada and
> the Cascades.

CR 03894.  Further, Zielinski's research indicates that "[t]he

literature is replete with references to the potential for

negative competitive interactions between the [] fisher and the

[] marten, usually with the martens suffering from the

interaction."  CR 03890.  Because Zielinski's research states

that sites such as the Project area may not be suitable for

fisher conservation or reintroduction due to the overlap with

marten and areas dedicated to maintaining habitat connectivity

for the marten, this research is not inconsistent with the Forest

Service's conclusions set forth in the FEIS that the Project

would not impact fisher habitat due to overlap with the marten.

Plaintiffs also assert that the FEIS failed to take a hard

look at the impact of the project on the fisher because the

Forest Service's conclusion is based upon the incorrect premise

that "fisher do not appear to overlap with marten."  Plaintiffs

contend that this conclusion is inconsistent with research from

the Sierra Nevada and elsewhere documenting that fisher and

marten can and do occur in the same area.  CR 3879-80.  However,

the FEIS acknowledges that "marten and fisher occasionally occupy

the same areas," but notes that "in general there is very little

overlap of fisher sighting with those of marten."  CR 02048.

Therefore, plaintiffs' contention that the Forest Service relied

upon an incorrect premise is erroneous.

///

The conclusion in the FEIS that the project area would not impact fisher habitat is not premised on the conclusion that fishers and martens cannot co-exist, but rather because of the overlap between fisher and marten.  Further, the recent Zielinski research is not inconsistent with this conclusion.  Thus, despite defendants' failure to analyze this data, the FEIS took the necessary hard look at the Project's impact on the Pacific fisher and its habitat.

### 3.  California Spotted Owl

Plaintiffs contend that the FEIS fails adequately to analyze and disclose the project's likely adverse impacts to the California spotted owl and its habitat.  At the outset, plaintiffs contend that the FEIS underestimates the owl's imperiled status in the project area.  The EIS cites a 2003 analysis of owl population trends to support the conclusion that spotted owl populations "are either stable or only slightly declining."  CR 02012.  However, plaintiffs point to the comments and statistics submitted by Dr. Jennifer Blakesley,[17] an expert relied upon in the FEIS for her studies relating to the California spotted owl, that demonstrate that the number of territories within the Project area occupied by resident spotted owls has declined from 11 in 1992 to 5-6 in 2002-2004.  CR 03906. Blakesley describes this as an "alarming decline in the number of owls within the Creeks project area."  CR 03906.  However, the Forest Service does not evaluate this information in the FEIS.

[17]   Dr. Jennifer Blakesley, holding a Ph.D. in Wildlife Biology from Colorado State University, has conducted research on northern and California spotted owls over the past 17 years.  CR 03905.

1    Plaintiffs also attack the Project's reliance on the minimum
2    threshold requirements for suitable habitat for the owl.
3    Defendants argue that in all but two of the nest core areas
4    within or adjacent to the Project area, the Project will maintain
5    suitable habitat above the 50% threshold suggested by plaintiffs.
6    However, defendants confuse the threshold minimums applied to owl
7    nest core areas and owl home ranges.

8    With respect to owl home ranges - which are 4500 acre areas
9    surrounding the activity center - plaintiffs assert that the FEIS
10   inexplicably waters down a 50% standard and instead bases it
11   analysis on the assumption that 30% habitat within each home
12   range is "the minimum threshold."  Defendants rely on a study
13   which sets a threshold of 30% to 50% suitable habitat in home
14   ranges to ensure long-term viability.  CR 02022.  Plaintiffs
15   contend that this same study was referenced in the 1999 QLG FEIS,
16   but in that case, a 50% minimum was used and therefore, to the
17   extent that defendants seek to use a lower threshold, it is
18   changing its methodology and needs to provide a rational
19   explanation for its change.  See Native Ecosystems, 418 F.3d at
20   964.  However, the Forest Service has not changed its underlying
21   methodology.  The Forest Service continues to rely on the study
22   which sets a minimum percentage somewhere in the range of 30%-
23   50%.  The Forest Service's decision to use a 30% minimum in this
24   Project as opposed to a 50% minimum is not inconsistent with the
25   underlying study relied upon in the FEIS and does not require
26   further explanation.

27   However, the Forest Service's discretion to use a 30%
28   threshold for owl home ranges does not resolve the issue of the

30

minimum thresholds applied to *owl nest core areas*.  With respect
to owl nest core areas – which are 500 acre areas surrounding the
activity center – the FEIS states that "Blakesley's data
indicates that 50% habitat within the core area is an important
threshold."  CR 02022.  However, in her comment to the FEIS,
Blakesley states that "[t]his statement is completely erroneous."
CR 03905.  Blakesley contends that her research has never
indicated that there is such a "critical threshold."  CR 03905.
Further, Blakesley provides that her data indicates that 83%
suitable habitat within nest core area is a reasonable minimum
target, and that anything less than 71% should be unacceptable as
a management target.  CR 03905.  There is no indication that the
Forest Service responded to or weighed these comments.  This is
particularly troubling where the expert, upon whose data the
Forest Service relies, submits that the Forest Service is
misinterpreting that data and that the conclusions reached by the
Forest Service are not supported by that data.  Nor does the
Forest Service cite any other experts for its interpretation of
Blakesley's data.  CR 02022.  Therefore, without offering a
rational explanation for its conclusion that Blakesley's data
supports a 50% minimum threshold for owl nest core areas and
without a discussion of Blakesley's assertion that the Forest
Service misstated and misapplied her data, the court cannot find
that the Forest Service took the requisite hard look at the
Project's effect on the California spotted owl's habitat.

### 4.   Pileated Woodpecker

Plaintiffs contend that the FEIS overlooked the Project's
impact on the pileated woodpecker and its habitat.  Specifically,

31

1   plaintiffs assert that the FEIS fails to offer a rational

2   explanation for its conclusion that the Creeks projects would

3   have no effect on the pileated woodpecker, despite the logging of

4   large snags and the reduction of future recruitment of such

5   snags.  Defendants contend that a wide range of recent research

6   was used to develop the conclusions in the FEIS[18] and that while

7   plaintiffs may disagree with the conclusions reached, the agency

8   was within its discretion to adopt the research and findings of

9   its experts.

10      The FEIS acknowledges that the "current snag densities are

11  below the Forest Guidelines" and that "there would be a general

12  reduction in the number of snags within the areas treated."  CR

13  02006, 02008.  However, the FEIS predicts that after the initial

14  small drop in the overall percentage, snags and snag numbers

15  "would continue to increase within the project area due to

16  natural recruitment process."  CR 02008.  The FEIS also predicts

17  that "down wood material are expected to increase within the

18  project area over time" and that "large wood recruitment [] would

19  increase due to project activities."  CR 02008.  In analyzing the

20  Project's impact on the pileated woodpecker, the FEIS again

21  states that most lands within the project area would not meet the

22  criteria for high or moderate quality habitat "due to the snag

23  densities and age and size class of the stands."  CR 02081.  To

24  the extent that there are lands that would fall into the moderate

25

26         [18]   Defendants cite: (1) Bull, E., 2005 Study of the
    effects of thinning on Pileated Woodpecker (CR 02654), (2)
27  Robinson and Alexander, 2002 – Habitat Descriptions (CR 03441),
    (3) Sauer et al. 1999 – Population trends (CR 03494), and (4)
28  local distribution data specific to the Lassen area (CR 02736).

1   to high quality suitability category, the Forest Service relied

2   upon a 2005 study by Bull, which concluded "that fuels reduction

3   projects do not necessarily preclude use by pileated woodpecker,

4   if sufficient down wood and snags are retained." CR 02082.  The

5   Forest Service concluded that "[b]ased upon the data supplied,

6   the snag and down log retention guidelines are expected to retain

7   sufficient foraging substrates as described by Bull." CR 02082.

8        Plaintiffs argue that a recent study on landbirds in the

9   Lassen area, commissioned by the Forest Service, recommended that

10  "as many snags as possible" be retained, with an "absolute

11  minimum" of 4 snags/acre with "priority given to the largest

12  ones." CR 5270.  However, the FEIS does address the issue of

13  maintaining minimum snag requirements, but concludes that "it is

14  more important to ensure that a landscape has continual snag

15  replacement as opposed to direction that requires a set number of

16  snags within a given area." CR 02008.

17       Therefore, because defendants' conclusion that the Project

18  would not affect the pileated woodpecker is supported by expert

19  studies, and because defendants' considered a minimum snag

20  requirement (although ultimately rejecting it), the FEIS took the

21  requisite hard look at the Project's impact on the pileated

22  woodpecker.

23  **II.  National Forest Management Act**

24       Plaintiffs also seek a declaration that the Project violates

25  the National Forest Management Act in that it is inconsistent

26  with the Lassen LRMP, as amended.  As an initial matter, the

27  parties dispute which regulations apply to the Project.

28  Defendants assert that the 1982 regulations do not apply because

33

these regulations were repealed on January 5, 2005 and replaced
by new planning regulations.[19]  While that is generally true, the
Project continues to be governed by the 1982 regulations because
the Lassen LRMP was prepared under the 1982 regulations,[20] and
thus, those regulations continue to govern all management of the
Lassen National Park until a new LRMP is passed under the 2005
regulations.  Idaho Wildlife Fed'n v. Tower, No. CV 04-371, 2006
WL 988494, at *1 (D. Idaho Apr. 13, 2006) (citing Utah Envtl.
Cong. v. Bosworth, 439 F.3d 1184, 1191 (10th Cir. 2006) ("stating
that 1982 regulations extend beyond preparation of LRMP and
'continue [] throughout the [LRMP's] existence'")).  The Forest
Service cannot later dilute its obligations, including monitoring
designated management indicator species ("MIS"), "by passing new
regulations without also amending the LRMP that relied on the
greater obligations. . . . That would violate a cardinal
principle of NFMA that the management of an area be consistent
with its LRMP."  Id. (citing Ecology Center, Inc. v. Austin, 430
F.3d 1057 (9th Cir. 2005)).  Therefore, the court will apply the
1982 regulations.

### A.   Viable, Well Distributed Populations of Wildlife

Plaintiffs contend that the Project fails to insure viable,
well-distributed populations of the California spotted owl and

---

[19]     While agencies are entitled to deference to their
interpretation of their own regulations, Forest Guardians v. U.S.
Forest Serv., 329 F.3d 1089, 1097 (9th Cir. 2003), that deference
must give way when the agency's interpretation of its regulation
runs counter to the governing statute.  See Auer v. Robbins, 519
U.S. 452, 457 (1997).

[20]     The Ninth Circuit has recently held that "NFMA
regulations promulgated in 1982 apply to the 2001 Framework and
2004 Supplement."  Earth Island, 442 F.3d at 1173.

1    the American marten.  The regulations that applied when the

2    Forest Service adopted and amended the Lassen National Forest

3    plan require that:

>    Fish and wildlife habitat shall be managed to maintain
>    viable populations of existing native and desired non-
>    native vertebrate species in the planning area.  For
>    planning purposes, a viable population shall be
>    regarded as one which has the estimated numbers and
>    distribution of reproductive individuals to insure its
>    continued existence is well distributed in the planning
>    area.  In order to insure that viable populations will
>    be maintained, habitat must be provided to support, at
>    least, a minimum number of reproductive individuals and
>    that habitat must be well distributed so that those
>    individuals can interact with others in the planning
>    area.

11   36 C.F.R. § 219.19.  This regulation has been interpreted to

12   require that the Forest Service "ensure a proposed action will

13   not cause a loss of viability of an existing species."  Inland

14   Empire Public Lands Council v. United States Forest Service, 88

15   F.3d 754, 761 (9th Cir. 1996).  Further, the ROD implementing the

16   2004 Framework provides that management direction strategy is

17   "aimed at sustaining viable populations of at-risk species

18   associated with old-forest ecosystems well-distributed across

19   Sierra Nevada national forests."  CR 00082.

20       In this case, the Forest Service concluded that the Project

21   "may affect individuals, but is not likely to result in a trend

22   toward Federal listing or loss of viability" for the California

23   spotted owl or the American Marten.  CR 00752.  Defendants assert

24   that this finding is well supported in the Biological

25   Evaluation/Biological Assessment ("BE/BA") of the Project.  In

26   support of this assertion, defendants reassert the same arguments

27   that they made in relation to plaintiffs' claims that the Forest

28   Service failed to take a hard look at the Projects impact on the

35

owl and the marten in violation of NEPA.  As set forth above in
the court's analyses of this issue, defendants failed to take a
hard look at the effect of the Project on the marten, its
habitat, and habitat connectivity because the Forest Service
failed to evaluate the most current research on the marten.  <u>Cf.</u>
<u>Inland Empire Pub. Lands Council. v. U.S. Forest Serv.</u>, 88 F.3d
754, 762 (9th Cir. 1996) ("We believe that an analysis that uses
all the scientific data currently available is a sound one.").
Also, as set forth above, defendants failed to take a hard look
at the effect of the Project on the spotted owl through the
failure to address conflicting information about the current
status of the owl and through the failure to provide a rational
explanation for the use of a 50% threshold for owl nest core
areas.  Because the Forest Service failed to consider scientific
data currently available in relation to the marten and failed to
adequately explain its conclusions in relation to the spotted
owl, the court cannot be reasonably certain that the Project –
which the Forest Service concedes may harm individual martens and
spotted owls - will not jeopardize the marten's and spotted owl's
viability.  <u>See</u> <u>Ecology Center v. Austin</u>, 430 F. 3d 1057, 1068
(9th Cir. 2005) ("Because the Forest Service failed to provide
the factual basis for its analysis and failed to adequately
explain its decision, we cannot be reasonably certain that the
salvaging . . . will not jeopardize . . . viability.").

**B.   Surveys of Management Indicator Species**

According to plaintiffs, the Forest Service violated the
NFMA's viability and diversity requirements by not conducting
population surveys of Management Indicator Species ("MIS").  As

set forth above, the NFMA regulations promulgated in 1982 apply to the 2001 Framework and 2004 Supplement.  See Earth Island, 442 F.3d at 1173.  These regulations require population monitoring.  See 36 C.F.R. § 219.[21]  "Because the 2001 Framework and 2004 Supplement were developed based on regulations in effect before November 9, 2000, transitional rules, not contained at 36 C.F.R. § 219.14, govern this case."  Earth Island, 442 F.3d at 1173-74.  The applicable regulation provides:

> For units with plans developed, amended, or revised using the provisions of the planning rule in effect prior to November 9, 2000, the Responsible Official may comply with any obligations relating to management indicator species by considering data and analysis relating to habitat *unless the plan specifically requires population monitoring or population surveys for the species*.

36 C.F.R. § 219.14(f) (emphasis added); Earth Island, 442 F.3d at 1174.  Rather than monitor every species present within a project area, agencies may monitor the MIS, which act as proxies for all species within a species association, to determine whether the agencies are satisfying the NFMA's viability and diversity requirements.  Klamath-Siskiyou Wildlands Ctr. v. U.S. Forest Serv., 373 F. Supp. 2d 1069, 1089 (E.D. Cal. 2004).  "An MIS species is a bellwether, or class representative, "for other species that have the same special habitat needs of population

---

[21]     36 C.F.R. § 219.19(a)(1) provides: "In order to estimate the effects of each alternative on fish and wildlife populations, certain vertebrate and/or invertebrate species present in the area shall be identified and selected as management indicator species and the reasons for their selection will be stated.  These species shall be selected because their population changes are believed to indicate the effects of management activities."

characteristics." <u>Earth Island</u>, 442 F.3d at 1173 (quoting <u>Inland</u>
<u>Empire Pub. Lands Council v. U.S. Forest Serv.</u>, 88 F.3d 754, 762
n.11 (9th Cir. 1996)).

Appendix E to the 2001 Framework identifies certain species
as MIS species, for which increased population monitoring is
required, and this framework is incorporated into the 2004
Supplement.  CR 00121 ("This Decision adopts the Monitoring Plan
presented in Appendix E of the SNFPA FEIS."); <u>Earth Island</u>, 442
F.3d at 1173.  The designated MIS listed in Appendix E include
the pileated woodpecker and the black bear.  The 2001 Framework
requires "distribution" monitoring for these species, <u>Id.</u> at E-
64, which is defined as data indicating "changes in the presence
of species across a number of sample locations" which are
designed to reveal "the status and change of populations" of the
species.  <u>Id.</u> at E-19.  Appendix E to the 2001 Framework also
provides that the Forest Service "will monitor the status and
change in the geographic distribution of martens . . . .
Monitoring the presence/absence of martens, across large areas
that are differentially affected by treatments," was planned in
order to "provide information that will inform future decisions
about management."  CR 42, Vol. 4, App. E at E-56.  The Framework
also states that "[b]ecause we do not yet have an empirical
habitat model that can distinguish suitable from unsuitable
habitat, it is necessary to monitor martens directly."  <u>Id.</u>

As an initial matter, plaintiffs assert that the Ninth
Circuit has held in almost identical circumstances that annual

38

monitoring of MIS was required.[22]  In <u>Earth Island</u>, the court

analyzed the same 2001 Framework and 2004 Framework at issue in

this case.  442 F.3d at 1175.  The plaintiffs in <u>Earth Island</u>

challenged the Forest Service's decision not to conduct

population monitoring of the hairy woodpecker and Williamson's

sapsucker.  <u>Id.</u>  Both of these species were listed as MIS in

Appendix E and were designated to be monitored in the form of

"distribution data."  <u>Id.</u>  The Ninth Circuit stated that "the

Framework expressly requires 'population monitoring,'

specifically in the form of 'distribution data'" and that "[i]t

is difficult to see how distribution data could effectively be

gathered in the absence of actual population monitoring."  The

court therefore rejected that Forest Service's argument that it

was under no obligation to determine population trends for the

two species at issue and held that the Forest Service's approval

and implementation of site-specific projects without appropriate

or sufficient population and habitat data is contrary to the NFMA

and governing provisions of the forest plan.  <u>Id.</u> at 1175-76.

In this case, Appendix E of the 2001 Framework, incorporated

into the 2004 Framework, requires "population monitoring" of both

the pileated woodpecker and the black bear in the form of

"distribution data."  Pursuant to the Ninth Circuit's decision in

<u>Earth Island</u>, the Forest Service has an obligation to determine

population trends for the pileated woodpecker and the black bear.

Likewise, because the 2001 Framework requires that the Forest

---

[22]    Defendants vigorously contend that population
monitoring is not required and that <u>Earth Island</u> was wrongly
decided.  However, the Forest Service's petition for rehearing <u>en
banc</u> in that case was denied on July 12, 2006.

1    Service monitor the status and change of the American marten, and

2    provides even greater detail as to why and how the marten should

3    be monitored, the Forest Service has an obligation to determine

4    population trends for the American marten.

5         Plaintiffs contest the Forest Service's decision not to

6    acquire annual monitoring and population trend data for the

7    marten, the pileated woodpecker, and the black bear, in

8    preparation for the Project.  Instead, the Forest Service

9    analyzed marten habitat as a proxy for marten population,

10   migratory monitoring information and Wildlife Service's Breeding

11   Bird Survey ("BBS") data as a proxy for woodpecker monitoring,

12   and California Fish and Game data as a proxy for bear monitoring.

13   Parties disagree as to whether the data evaluated by the Forest

14   Service is sufficient.  Plaintiffs assert that this information

15   is inadequate to satisfy defendants' obligations because "the

16   Forest Service has cobbled together bits and pieces of

17   information regarding the population or distribution of MIS,

18   gathered at different geographic scales and intensities and by

19   different agencies and organizations."  (Pls.' Opp'n, filed July

20   21, 2006, at 18-19).

21        The Ninth Circuit has interpreted 36 C.F.R. § 219.19(a) to

22   permit use of habitat as a proxy for population surveys in

23   certain circumstances.  Inland Empire, 88 F.3d at 761.  In Inland

24   Empire, the court confronted a challenge to the Forest Service's

25   proposed timber sale in the Kootenai National Forest  in

26   northwestern Montana.  In evaluating the effect of the Project on

27   species viability within the Project area, the Forest Service did

28   not conduct population surveys.  Rather, it "examined each

proposed alternative to see how many acres of each type of relevant habitat would remain after timber was harvested," and concluded that "a species would remain viable as long as the threshold percentage of each type of habitat remaining in the chosen alternative was greater than the percentage required for that species to survive." Id. at 759-760. The court recognized that such an approach "necessarily assumes that maintaining the acreage of habitat necessary for survival would in fact assure a species' survival." Id. at 761. However, the court found the assumption "eminently reasonable" and concluded that the habitat analysis as a proxy for population surveys was not arbitrary and capricious. Id. Similarly, in Idaho Sporting Cong. v. Thomas, the Ninth Circuit upheld use of habitat as a proxy for population where the Forest Service performed further analysis that demonstrated the Project would result in "no appreciable habitat disturbance." 137 F.3d 1146, 1154 (9th Cir. 1998).

The Court confronted the proxy on proxy issue again in Idaho Sporting Congress, Inc. v. Rittenhouse, 305 F.3d 957 (9th Cir. 2002). Distinguishing both Inland Empire and Thomas, the Rittenhouse Court held that use of habitat as a proxy was inappropriate in that case because the methodology used for monitoring habitat was unsound. Id. at 972. Specifically, the court noted that the Forest Service's methodology for identifying old growth habitat was demonstrably inaccurate and could not "reasonably ensure viable populations of the species at issue." Id.

///

///

41

### 1.   American Marten

Plaintiffs argue that the Forest Service has failed to gather and analyze adequate monitoring data for the American marten.  The FEIS states that marten data was obtained by placing baited camera stations in a designated grid pattern and that twenty-three camera stations have been placed in various locations throughout the project area from 1996.  CR 02047. However, the most recent survey work was completed in 2003.  CR 02047.  Further, the FEIS explicitly states that the

> [s]urveys only offer presence data and cannot provide any estimation of population numbers, reproductive success, or territorial data.  Therefore, assumptions on the status of the local population, other than to say that marten are present throughout the project boundary, cannot be made.

CR 02048.  Because the Framework requires that the Forest Service "monitor the status and change in the geographic distribution of martens," the statement in the FEIS that the data gathered and analyzed by the Forest Service cannot provide population numbers, reproductive success, territorial data, or even status of the local population severely undermines the assertion that the Forest Service adequately monitored the marten population.  Based upon this lack of information, the Forest Service cannot "reasonably ensure viable populations of the species at issue." As such, the Forest Service failed to satisfy the requirements for population monitoring for the American marten.

### 2.   Pileated Woodpecker

Plaintiffs also argue that the Forest Service has failed to gather and analyze adequate monitoring data for the pileated woodpecker.  Specifically, plaintiffs point to the section of the

FEIS which states that "[t]here is no local data on population

numbers."  CR 02090.

Defendants argue that the data for the pileated woodpecker

is sufficient to serve as a proxy for population monitoring

because the Forest Service relies on BBS data as well as landbird

monitoring being completed by the Point Reyes Bird Observatory

("PRBO").  In regards to the sufficiency of the BBS data, the

Ninth Circuit has previously held that "BBS data alone cannot

satisfy the population monitoring requirement." Earth Island,

442 F.3d at 1176.  In this case, the Forest Service's reliance on

BBS data is particularly problematic because the data tracks the

national population from 1966-1999.  CR 02080.[23]  In regards to

the sufficiency of the PRBO data, the information was derived

from 10 transects of various lengths within the proposed

treatment area from which point counts are taken and all birds

heard within 50 meters are noted.  CR 02068.  However, despite

this methodology and information acquired, the FEIS still

concedes that "[t]here is no local data on population numbers."

CR 02090.  As such, the court cannot conclude that the Forest

Service "reasonably ensure[d] viable populations" of the pileated

woodpecker.

Defendants also assert that the Forest Service perfomed a

detailed analysis of snags in the project area, a habitat

attribute essential for woodpeckers.  CR 02006-10.  However, the

---

[23]    When confronted with the Ninth Circuit's conclusion
that BBS data was insufficient to meet the population monitoring
requirement in Earth Island, the defendants again asserted that
they believed the case was wrongly decided.  However, this court
is not free to disregard Ninth Circuit precedent merely because
defendants disagree with it.

pages of the FEIS cited by defendant discuss only the effect of the project on "selected vegetative decadence," but do not discuss its relationship to the pileated woodpecker.  Therefore, the court cannot conclude that the analysis of snags performed by the Forest Service adequately substituted for the required population monitoring.  See Earth Island, 442 F.3d at 1175 ("It is difficult to see how distribution data could effectively be gathered in the absence of actual population monitoring.").

### 3.    Black Bear

Finally, plaintiffs argue that the Forest Service has failed to gather and analyze adequate monitoring data for the black bear.  Specifically, plaintiffs point to the section of the FEIS that states that "little data is available on the current status of the bear."  CR 02074

Defendants argue that the data analyzed relating to the black bear is a sufficient proxy for population data because the FEIS incorporates data from the California Department of Fish and Game.  Specifically, the FEIS provides that "[p]resently the statewide population is believed to be between 25,000 and 30,000" in comparison to between 10,000 and 15,000 in 1982.  CR 02074 (emphasis added).  The FEIS also provides that "[t]he Department of Fish and Game estimates that within Plumas County bear populations average .5 to 1.0 bear per square mile."  CR 02074 (emphasis added).

Defendants' data is insufficient to serve as a proxy for population monitoring.  First, the FEIS explicitly states that the population numbers set forth by the California Department of Fish and Game are beliefs and/or estimates about the current

44

status of black bears statewide and not specifically within the
Project area.  Second, the FEIS sets forth no information
regarding the methodology used to obtain this data.  Finally,
defendants fail to offer any analysis or factual basis for
determining the quantity or quality of suitable habitat.
Therefore, the Forest Service's analysis does not satisfy the
population monitoring requirement of the NFMA.

Based upon the foregoing analysis, the Forest Service's
approval of the Project without appropriate or sufficient
population and habitat data for the American marten, the pileated
woodpecker, and the black bear is contrary to the NFMA and
governing provisions of the forest plan.

**III.   Injunctive Relief**

Plaintiffs seek to enjoin the Forest Service from
implementing the Project until the Forest Service complies with
NEPA, NFMA, and the Lassen LRMP.  To determine whether injunctive
relief is appropriate, the court applies the traditional balance
of harms analysis.  National Parks & Conservation Ass'n v.
Babbitt, 241 F.3d 722, 737 (9th Cir. 2001) (quoting Forest
Conservation Council v. United States Forest Serv., 66 F.3d 1489,
1496 (9th Cir. 1995).  "Environmental injury, by its nature, can
seldom be adequately remedied by money damages and is often
permanent or at least of long duration, i.e., irreparable." Id.
(quoting Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531, 542
(1987)).  "If such injury is sufficiently likely, therefore, the
balance of harms will usually favor the issuance of an injunction
to protect the environment."  Amoco, 480 U.S. at 545.  Further,
the Ninth Circuit has repeatedly held that "absent 'unusual

45

circumstances,'[24] an injunction is the appropriate remedy for violation of NEPA's procedural requirements." Thomas v. Peterson, 753 F.2d 754, 764 (9th Cir. 1985) (citing Save Our Ecosystems v. Clark, 747 F.2d 1240, 1250 (9th Cir. 1984); Alpine Lakes Protection Soc'y v. Schlapfer, 518 F.2d 1089 (9th Cir. 1975); Lathan v. Volpe, 455 F.2d 1111, 1116-17 (9th Cir. 1971)).

In this case, the record demonstrates that it is sufficiently likely that implementation of the Project will cause irreparable harm to old forests through the unnecessary cutting

_____

[24] Defendant-intervenor SPI asserts that "unusual circumstances" exist in this case because it has been awarded timber sale contracts in relation to the implementation of the Project. However, SPI cites to no applicable cases where a court has denied injunctive relief in an environmental case based upon the award of timber sale contracts. Defendant-intervenor cites to the Ninth Circuit's decision affirming the denial of injunctive relief in Forest Guardians v. Dombeck, 131 F.3d 1309 (1997). However, in Forest Guardians, plaintiffs sought to retroactively apply amendments to the applicable Land and Resource Management Plan, and the court held that the Forest Service did not err in applying the old standards to prior existing agreements and applying the new standards to new authorizations, contracts, and permits. In this case, plaintiffs seek to enforce federal statutes, specifically NEPA and NFMA, that were applicable when the contracts were awarded to SPI. As such, Forest Guardians is inapplicable.

Further, based upon Ninth Circuit precedent relating to the weight given economic harm in an environmental case, the court finds SPI's argument unavailing.

Federal defendants also assert that they should be allowed further proceedings to present evidence that "unusual circumstances" weigh against injunctive relief. (Mem. P.&A. in Supp. of Federal Defs.' Mot. for Summ. J., filed June 26, 2006, at 7 n.3). However, when asked at oral argument what "unusual circumstances" they referred to, federal defendants deferred to SPI's counsel to present argument.

Federal defendants also request additional proceedings to present evidence to assist the court in fashioning the appropriate scope of any injunctive relief awarded. However, when asked at oral argument how relief might be shaped, federal defendants offered no suggestions or insight into how they might assist the court.

of trees that might otherwise survive.  See Earth Island, 442

F.3d at 1177.  The record also demonstrates that the Project will

likely cause irreparable harm to the wildlife that inhabit the

project area, including the California spotted owl and the

American marten.

In light of the above finding of potential irreparable harm

to the environment, the balance of hardships tips in plaintiffs'

favor.  Defendant-intervenor SPI argues that it will suffer

economic losses by enjoining the Project, and thus, the timber

sales.  SPI also argues that curtailments and layoffs will likely

occur at its Quincy sawmill and cogeneration facility.  (Decl. Of

Mark Bosetti in Supp. of SPI's Mem. of P.&A., filed June 26,

2006, ¶ 5).  The court is not unmindful of the adverse economic

consequences that can result when environmental laws are

violated.  Such consequences may include loss of revenues to both

the government and private business.  Importantly, workers, their

families, and the community also may be adversely affected by a

finding that the Forest Service has failed to abide by the legal

requirements of NEPA and NFMA.  Nevertheless, the "loss of

anticipated revenues . . . does not outweigh the potential

irreparable damage to the environment."  Babbitt, 241 F.3d at

738; Earth Island, 442 F.3d at 1177.  The Ninth Circuit has noted

"the importance of preserving the public's interest in

'preserving precious, unreplenishable resources.'"  Earth Island,

442 F.3d at 1177 (quoting Earth Island, 351 F.3d at 1309).[25]

_____

[25]   The court is troubled that the Ninth Circuit has
expressed concern over "a disturbing trend in the Forest
                                          (continued...)

47

The environment is a vital constituent public interest that must be recognized and protected by federal law even in the face of adverse economic consequences.

### CONCLUSION

For the reasons stated above, the court finds the following:

(1)   The Forest Service violated NEPA by failing to analyze an adequate range of alternatives, particularly alternatives involving less intensive logging.

(2)   The Forest Service violated NEPA by failing to take a hard look at the Creeks Forest Health Recovery Project's impact on the American marten and the California spotted owl.

(3)   The Forest Service violated NFMA by failing to insure viable, well-distributed populations of the American marten and the California spotted owl.

(4)   The Forest Service violated NFMA by approving the Project without appropriate or sufficient population and habitat data for the American marten, the pileated woodpecker, and the black bear.

///
///
///
///

---

[25](...continued)
Service's recent timber-harvesting and timber-sale activities," Earth Island, 442 F.3d at 1177-78 (collecting cases), observing that, in many recent cases analogous to this case, the Forest Service "appears to have been more interested in harvesting timber than in complying with our environmental laws."   Id. at 1178.

48

Based upon the above findings, the court hereby enjoins the Forest Service from implementing the Creeks Forest Health Recovery Project until and unless the Forest Service complies with NEPA, NFMA, and all applicable laws, and an EIS is prepared in conformity with NEPA and NFMA.

IT IS SO ORDERED.

DATED: September 6, 2006.

/s/ Frank C. Damrell Jr.
FRANK C. DAMRELL, Jr.
UNITED STATES DISTRICT JUDGE